*1687 The opinion of the court was delivered by
Monroe, J.
These are suits involving various transactions between R. T. McDonald, of the one part, and M. J. ITart, representing his father, Judah ITart, and M. J. ITart, representing himself, of the other part. They were consolidated by consent in the lower court, and come up, on appeal, as one case, under an agreement to the effect that judgment may be rendered for and against the parties, respectively, as the law and the evidence may warrant. Since the suits were filed, Judah ITart and McDonald have died, and their legal representatives have been made parties.
The claims and counter claims set up may be stated as follows, to-wit: Judah .ITart sued McDonald for a half interest in 540 shares of the stock of the Southern Ice Company, which he alleges were purchased for joint account, but which stand in the name of, and are controlled, by McDonald. To this, McDonald answered, admitting that the stock was purchased for joint account, but alleging that ITart furnished only $12,500.00, whilst ho furnished $91,793.77; and that, after deducting dividends received by him, ITart will still have to put up $34,436.38 in order to pay his share of the net amount expended. Thereupon, ITart was permitted to file a supplemental petition, in which he denies owing'the balance thus claimed, and alleges that he, at various times, furnished McDonald with monies to the aggregate amount of $103,473.87, as per “Exhibit A,” which he annexes to, and makes part of, said supplemental petition; and that, of this sum, a sufficient amount should be imputed to the payment of any balance which may be found due by him on account of said joint transaction in Ice Company stock; and he prays judgment, as in his original petition. This supplemental petition was objected to, as changing the issue, but the objection was overruled, and has not been insisted on in this court. The Exhibit “A,” thus made part of the plaintiff’s claim, shows ten distinct items, each of which represents a different transaction, in which plaintiff alleges that there is a balance due him; the aggregate amount being, as stated, $103,473.87. To this, the defendant answered, that, in each of said transactions, there was a balance due to him, for which he reserved the right to bring' suit.
Whilst matters were in this condition,' M. J. Hart sued McDonald for $500,000.00, being damages said to have been sustained by him by reason of the failure of McDonald to finance a scheme, for the building *1688 of sewers in New Orleans, in which they were mutually interested, and for which, he alleges, McDonald had agreed to furnish the money. And, a little later, McDonald sued Judah Hart for $20,000.00, which, he alleged, had been furnished for the purposes of said sewerage business (in which, according to his theory, Judah Hart, and not M. J. Hart, was interested) and which had been appropriated by said Judah Hart, or his agent M. J. Hart, or S. J. Hart, to his own private use. Thereafter, these two suits were consolidated with the original suit of “Judah Hart vs. McDonald,” and further pleadings were filed, to-wit: McDonald filed another answer, and ^conventional demand, in which he sets up, in detail, his claims with respect to the transactions referred to in Judah Hart’s Exhibit “A,” and with respect to some other transactions, and prays judgment for $370,899.45, alleged to be due him. And the heirs of Judah Hart answer this reconventional demand, by setting up some matters not included in the petition and supplemental petition previously filed, and praying judgment for $164,654.83.
It may be remarked here, however, that, in the course of the trial, it was distinctly admitted, on behalf of Judah Hart, that he had no claims other than those stated in his “Exhibit A,” amounting to $103,473.87, to which some interest is to be added; so that, by taking up the items set forth in that “Exhibit,” we shall be dealing with a large proportion of the issues presented by these somewhat unusual pleadings. “Exhibit A” purports to be an account rendered by Judah Hart to McDonald and begins in this way:
“New Orleans, January 21st, 1897.

“R. T. McDonald,

“In account with Judah Hart.”
And then follow the ten different items which have been mentioned, and which will be considered serialim, to-wit:
I.
“March 1, 1893. Paid on account of Southern Ice Co.. .$12,500 00
“Six per cent, on $12,500.00, from March 1, 1893 to January 20, 1897 (computed every six months)................ 3,232 13
$15,732 13”
*1689 This $12,500.00 was one-half of $25,000.00 which was the first payment on the stock of the Southern Ice Company for the recovery, in kind, of one-half of which the original suit was brought by Judah Hart. It is admitted that the plaintiff can not recover both the money and the stock. The facts seem to be as follows, to-wit:
The whole outstanding issue of the stcjck was bought for the joint account of Hart and McDonald, for $71,000.00. Of this amount, McDonald advanced $25,000.00 to make the first payment, and gave his obliga^ tion, in the sum of $46,000.00, for the balance, and subsequently paid it, with interest. Hart reimbursed $12,500.00 of the first, cash payment, but has never paid anything more. In his answer (to the reconventional demand), he alleges that “R. T. McDonald was delegated to make the purchase, which he did, paying $25,000.00 on account”, and the evidence shows, without contradiction, that the $25,000.00 was paid by McDonald. Beyond this, Hart and McDonald, being the owners of the business, and money being required for its purposes, such money was furnished by McDonald, partly from his own funds, and partly from dividends and commissions collected for the joint account of Hart and himself, so that the total amount paid out by him, in paying for the stock and making advances, including interest, calculated after a fashion agreed on between the parties, amounted, on March 1, 1898, to $118,-127.87.
In order to ascertain the proportion of this amount to which McDonald is entitled to credit, for the purposes of the present question, we must deduct therefrom the amount paid by Hart, consisting of (1) the $12,500.00 which he contributed to the first payment on the stock, amounting, with interest to March 1st, 1898, to $16,798.16; and (2) his proportion of the dividends and commissions collected by. McDonald for account of the Southern Ice Co., and used in making payments and advances for that company. This, we understand, amounts to $17,572.38, and is arrived at as follows, to-wit: McDonald is charged with $302,-857.73, as the total amount received by him from the City Delivery Co. in the way of dividends and commissions. But, of this amount, payments were made in satisfaction of a judgment obtained against Hart and McDonald by the Blymer Ice Machine Co. which amounted, with interest, calculated to March 1,1898, to $35,757.50, so that the amount of dividends and commissions available for other purposes is to be reduced *1690 from $302,857.73, as stated by Mr. Duncan, to $267,100.23, of which the Southern Ice Co. was entitled to 50-380, or $35,144.76, and one-half of this sum, or $17,572.38, should be credited to Hart.
The two amounts then, — $16,798.16 and $17,572.38, added together, make $34,370.54, and that amount deducted from $118,127.87, leaves $83,757.33 as the amount to which McDonald is entitled to credit, as against $34,370.54 to the credit of Hart. The balance, or difference, in favor of McDonald, being $49,386.79, one-half of which, with interest, Hart would have to pay in order to entitle himself to the one-half of the stock, which he claims.
The suggestion that the money advanced by McDonald to carry on the business was advanced to the corporation and not to Hart — and that McDonald is not entitled to be credited with it in this litigation, is illogical and untenable. If it be' adopted, Hart would have no standing to claim the benefit of the commissions and dividends received by McDonald, since they were received from the City Delivery Company, for account of the Southern Ice Co. and not for Hart’s account.
II.
July 1, 1893, dividends collected on 663 shares Traction Co. preferred stock, at $3.00 a share......................$1,995 00
6 per cent, interest on $1,995.00 from July 1, 1893, to January 20, 1897 (computed every six months)................ 461 53
$2,456 53
It appears that Hart and McDonald owned, each, 665 (not 663) shares of the preferred stock of the Traction Company, which stood in McDonald’s name when the books were closed for the purposes of the dividend declared about July 1, 1893. This dividend was paid in New York, by J. & W. Seligman & Co., who credited the proceeds on McDonald’s margin account. McDonald undertakes to explain that the proceeds were credited by Seligman & Co. to the joint account of Hart and McDonald in a transaction whereby $90,000.00 of Traction Company stock had been purchased, and yet he says that the dividend, though declared, had not been earned, and was to be paid only to “outside” stockholders, and not to large “inside” stockholders, like Hart and himself. These two theories do not hang well together and neither of *1691 them accords with the facts as we find them. There is no doubt that a cheek for the dividend was drawn to the order of McDonald and in dorsed by him to Seligman & Co. and that Seligman & Co. placed the proceeds to the credit either of McDonald or McDonald and Hart. Selingman & Co. wired Hart at one time that the amount had been credited on the $90,000.00 transaction and “other indebcedness” of McDonald’s. But McDonald, in the course of the trial, offered a paper, purporting to he a copy of a statement of the $90,000.00 transaction, which he said had been furnished him by Seligman & Co.; and, whilst it was ruled out, as against Hart, it is, nevertheless, in the record, in connection with McDonald’s testimony, and -is good evidence against him. That paper shows that the $90,000.00 subscription was paid by other monies than the dividend, and the latter does not figure on it at all. We therefore conclude that McDonald is liable for this item, as claimed.
III.
“Oct. 10, 1893, draft for $12,500.00, of which $7,500.00 paid in Eort Wayne, leaving balance 'due...................$5,000 00
“6 per cent, interest from Oct. 10, 1893, to Jan. 20, 1897 (computed every six months) ....................... 1,067 42
$6,067 42
McDonald recognized a certain debt of $12,500.00, due to Hart, and gave his check for $7,500.00 in part payment, and for the balance, of $5,000.00, authorized a transfer of credit on the books of the Municipal Ice Co., of which concern he was a creditor, in an amount exceeding $5,000.00. This was satisfactory, and was accepted by Hart, and, by his direction, he was credited on the books of the company with $5,000.00, and McDonald’s account was debited with a like amount; and the matter stood in that way for three years.
At the time the transaction took place, Hart gave a receipt reading as follows:
“Received from R. T. McDonald, cheek on the Hamilton National Bank, Fort Wayne, Ind., for seventy-five hundred dollars ($7,500.00), payable to the order of Judah Hart, for account of ‘Sewerage’ notes, which he. Hart-, took up, renewals of which were sent to him, McDonald, amounting to over twelve thousand dollars ($12,000.00) — the other *1692 five thousand dollars to be collected from the Municipal Ice Co. and charged to him against money which had been advanced by him to the Consumers’ Ice Co., for account of the Municipal Ice Company.”
Later on, the entry on the books of the Municipal Ice Co. was can-celled and reinstated, and again -cancelled, but we are of opinion, upon the whole, that nothing subsequently done affected the transaction as originally made, and that Hart has, therefore, no standing with respect to this claim.
TV.
“May 1, 1894, your note, due Traction Co................$18,000 00
“5 per cent, interest on $18,000.00 from May 1, 1894, to Jan. 20, 1897 ..................................... 2,450 00
$20,450 00
It appears that the stockholders in the Traction Company were called on, each, to contribute a certain amount of the common stock held by them, in order to aid the company upon an occasion of financial embarrassment. Among others to contribute, were Plart and McDonald, each of whom put up 1000 shares, for which the company gave its notes at $18.00 a share. These notes went into the hands of Seligman & Go., in New York, and not into the hands of either McDonald or Hart. As we understand the testimony, the proceeds of the notes were credited by Seligman & Co. on the subscription of Hart and McDonald to $90,000.00 of Traction Co. preferred stock, and that transaction eventually showed a profit of $11,626.31, which was collected by McDonald, in February, 1895. He, therefore, owes Hart one-half of that amount, or $5,813.15, with interest.
V.
“Dec. 24, 1894, paid on account of Waterworks stock......$15,000 00
“6 per cent, interest on $15,000.00, from Dec. 24, 1894, to Jan. 20, 1897 (computed every six months).......... 1,956 39
$16,956 39
In February, 1893, Hart and McDonald bought 3000 shares of waterworks stock, from the New Orleans National Bank, at $120.00 per *1693 share. Sixty thousand dollars was paid, of which Hart paid $45,000.00 and McDonald $15,000.00. The stock seems to have remained pledged to the bank for several years, the pledgors paying 6 per cent, interest, and receiving 5 per cent, as dividends on the stock, so that there was a difference in interest against them, which had to be settled, from time to time. On several occasions, Hart (always represented by the one or the other of his sons and agents, M. J. or S. J. Hart) was unable to respond to the calls of the bank, and McDonald made the necessary payments. At one time, he seems to have been drawn on for $3,000.00, at another, Hart wrote him for $500, and, in November, 1895, Hart wrote.him a letter, embodying a statement of the condition of the transaction, showing that, after payment of $5,399.71 of interest then due, they would owe $105,480.44, and concluding as follows, to-wit:
“I wish you would pay the entire amount of this interest as it is not convenient for me to pay my share of it to-day. I will account to you for my half of it. I further authorize you, if you desire, to take up any or all of these obligations, receive the collateral therefor, and either hold my one-half of the same, as collateral for the one-hali you paid on my account, with full power to pledge the same for the amount due thereon. We also have our joint note, due Mr. Craig, for $4,000.00, upon which there is due, after deducting the dividend to-day, $3,920.28, with forty shares of stock as collateral, and I also authorize you to pay this note, take the collateral and use the same, or hold the one-half for the one-half I owe of this note.”
A year later, in November, 1896, Hart claims to have written a letter, the receipt of which is not admitted, to the following effect:
“I found upon calling' at the New Orleans National Bank that you had done your part towards effecting a division between us of the three thousand shares of water works stock pledged to R. E. Craig and others, and that you had done so by handing to the pledgees a note requesting them to make a certain disposition of fifteen hundred shares of the stock, being your proportion of the same, and making arrangements for paying one-half the debt due on the stock. As to the other half, you— -that-all claim to it, and that the pledgees are at liberty to deliver it to me or to my assignees, on payment of my share of the obligation. I have, therefore, executed a similar instrument, and have taken possession of fifteen hundred shares of the stock. I enclose *1694 you a copy of the document which I have signed, and now notify you, that, in effecting a partition of this stock, I do not release you from claims which I have against you in connection with monies put up as part payment upon, or margins, upon this stock, claims which I still reserve, and shall urge at the proper time.”
M. J. Hart, in testifying as to the transaction, says: “Well, I know there was a loss, because the stock was divided, he taking his portion and Judah Iiart taking his”; and he further testifies, substantially, that the claim is made for the $15,000.00 without regard to whether there was a loss or not, because they were unable to get an account from McDonald. Upon the other hand, McDonald testifies that, at the time he was called on, in November, 1895, to pay the $5,399.71 of interest, there was a dispute as to whether he had paid his share in the transaction up to that time, and that he refused to pay theTnterest until the question was settled, and unless Hart obligated himself to refund one-half of the interest so paid, apd that it was so agreed. This version is corroborated by the letter of November, 1895. We think, upon the whole, that the evidence justifies the conclusion that the matter was agreed upon and settled upon the basis of McDonald’s having paid his share at the date of the payment by him of the $5,399.71; and that Hart has, therefore, no further claim with respect to this item.
VI.
“Dec. 24, 1894, balance due on Melpomene Canal certificates. .$4,000 00 “6 per cent, interest on $4,000.00 from Dec. 24, 1894, to Jan.
20, 1897 ........................................... 521 69
$4,521 69
McDonald undertook to raise money for Hart on certain certificates of indebtedness of the city of New Orleans; and, after the matter was settled up with the lenders of the money, to whom the certificates were pledged, there was a balance of $4,000.00, due to the owner of the certificates, which was collected by McDonald, in whose name they appear to have been pledged, which amount he retained as compensation for his services and for the use of his credit. There is nothing in the evidence to warrant this retention, and Hart should recover the $4,000.00 with interest. This is conceded by McDonald.
*1695 VII.
“June 29, 1895, 15 mortgage bonds of $1,000 each of La. Electric Light Co..................................¡ $15,000 00
“6 per cent, interest on $15,000.00 from June 29, 1895, to Jan. 20, 1897 ..................................... 1,448 99
$16,448 99
In June, 1895, there was a transaction between Hart and McDonald, which the following note from the latter to M. J. Hart (who represented Judah Hart) explains:

"Mr. M. J. Hart—

“Dear Sir — I have received from you, transfer of city revenue, with note of Louisiana Electric Light Company for $15,000.00. I agree to send you for this, $15,000.00 of the first mortgage bonds of the Louisiana Electric Light Co. The question of interest, we will hereafter adjust. • (Signed) “K. T. McDonald."
The history of this transaction as it appears from the evidence, is as follows:
McDonald, for some reason, was interested in having Hart send fifteen mortgage bonds of the Louisiana Electric Light Co. on to the American Loan and Trust Company, and Hart did so, upon McDonald’s assurance that he would see that they were returned. Thereafter, however, Hart obtained from the Louisiana Electric Light Co. its note for $15,000.00 — secured by a transfer of city revenue (being a claim against the city for lighting), the consideration of said note being the same bonds for which McDonald had made himself responsible. This note with the collateral, he turned over to McDonald, taking therefor, the receipt which has been hereinabove copied. So that the bonds, and everything representing them, which Hart had, may be said to have passed into the hands of McDonald, who gave nothing except his promise to return the bonds. McDonald parted with the note and its collateral, and doubtless obtained value for them. They passed into the hands of the General Electric Company of New York, with Judah Hart as indorser of both the note and the collateral, and, the maker having failed to pay, the note was protested and Hart’s liability fixed. In this condition of affairs, Hart had a transaction with the General Electric *1696 Co., whereby, as part of the consideration moving’ from said company to him, the company agreed to cancel his indorsement and to relieve him of liability with respect to said note and collateral, which the company, however, retained.
It is plain that, if Hart had been obliged to give a consideration to McDonald in order to be relieved of liability on the note in question, that circumstance would not relievo McDonald of his liability, as evidenced by the receipt which has been herein above copied. On the contrary, it would add to the liability by just the amount of the consideration so given. And the same is true as the matter stands; the consideration having been given to rare to whom McDonald had transferred the note for value received by him. As it appears to us, Hart has received nothing for the note, but has par'd to be relieved from liability on it. And he has not received the bonds which 'McDonald agreed to return to him whilst McDonald has received value for the note which he obtained from Hart, and has also had Hart’s bonds >used to subserve his purposes and as requested by him.
We think that Hart is entitled to recover on this item.
VIII.
“July 13, 1895, 45 coupons of $30 each, of La. Electric Light Co. bonds .........................................$1,350 00
“6 per cent, interest on $1,350.00 from July 13, 1895, to Jan. 20, 1897 (computed every six months) ................ 127 OS
$1,477 08
The bonds of the Electric Light Co. were in the hands of the Trust Company; the interest was about to mature, and the company was not in funds. Default in the payment would have threatened the existence of the company, it was therefore necessary for those who were concerned in its continuance, either that the coupons which were falling due, should be surrendered, or that the Trust Company should be provided with money with which to pay them. The bond holders were called upon to contribute their coupons, and they did so, with the exception of Hart, who exacted an obligation, from the acting secretary of the company, that he should be paid for those which he surrendered. McDonald’s only connection with the matter was a telegram urging Hart to *1697 make the surrender; and, possibly, requests or instructions to the officers of the company to get him to do so. As far as we can gather from the testimony, McDonald, who surrendered his own coupons, was no more interested in the matter than Hart. Nor were Hart’s coupons given to McDonald. They were given to the company, and the company has, as against his claim for the $1,350.00’ which they represented, a claim for $1,500.00 loaned Hart, as a special accommodation, a year before the coupon transaction, for which he had given a check which the bank refused to honor. We can find no just claim against McDonald arising out of this matter.
IX.
“Aug. 25, 1896, 17 Municipal Ice bonds of $1,000 each, with coupons January, 1897, attached....................$17,000 00
“6 per cent, interest on $17,000.00 from July 1, 1896, to Jan. 20, 1897 .......................................... 566 66
$17,566 66
It is admitted that McDonald is liable for the value of these bonds at 40 cents on the dollar. Counsel for Hart seems to think that this is not enough, but we are unable to find anything in the record which would justify a higher valuation. The fact that McDonald satisfied a certain judgment with the bonds does not fix their value, because, as we understand it, the judgment so satisfied was payable in the bonds, and might have been satisfied with them if they had been worth only ten cents on the dollar or nothing. There Should, therefore, be judgment on this item for $6,800.00 with interest.
X.
“Nov. 26, 1896, balance due by N. O. Sewerage Co.........$1,778 89
“6 per cent, interest on $1,778.89 from Nov. 26, 1896, to Jan. 20, 1897 ........................................... 18 09
$1,796 98
There is not sufficient evidence in the record to entitle the plaintiff to a judgment on this claim.
*1698 XL
The Ice Companies.
Ilart and McDonald built and owned the Municipal Ice Company, and bought the whole of the stock of the Southern Ice Company, as has already been stated. They also organized a company called the “New Consumers’ Ice Co.”, by means of which they acquired control of the “Consumers’ Ice Company”, a pre-existing organization which was heavily in debt, and the plant of which had been badly wrecked by an explosion. They were jointly interested in these ventures ami were to divide the profits and losses, share and share alike. In order to secure their successful prosecution, there was organized an additional corporation called the “City Delivery Company”, which was to act as the selling agent, not only for the Hart and McDonald companies, but for certain other companies, which were equally represented in said City Delivery Company.
The capital stock of the City Delivery Company was fixed at $10,-000.00. One-half of it stood in the name of McDonald and the other half in the name of one L. P. Hart (a person not connected with the parties to this litigation), who> represented the other companies, in the agreement.
L. P. Hart an'd another person, representing the same interest, were each to receive $5,000.00 a year, for five years, and, as a set-off to this, McDonald was to be allowed a commission of fifty cents a ton on all ice sold by the company, the ice to be taken in equal proportions from the Hart and McDonald companies and the companies represented by L. P. Hart; charged to the City Delivery Company at $2.00 per ton (which was about the cost of production), and sold by said City Delivery Company at such infices as the parties in interest might fix, which varied from $3.00 to $7.00 or $8.00 per ton; so that, all the profits accruing to the Hart and McDonald companies were represented by the dividends declared by the City Delivery Company on the stock standing in the name of McDonald and by the commissions received by him from said City Delivery Company; and these profits were used by McDonald in making advances to the said Hart and McDonald companies, and in reimbursing the advances so made, by means of settlements with said companies, from time to time, and proper entries on their books.
Upon the trial in the court a qua, there were two expert bookkeepers *1699 employed. One of them was O. W. Duncan, who was Hart’s bookkeeper (that is to say, he was bookkeeper of the Rosetta Gravel Company, a corporation owned by Hart) at the time that McDonald made his acquaintance and at the time that McDonald and Hart entered into the ice business. Mr. Duncan kept the books of the Municipal, and New Consumers’ Ice Companies and superintended the keeping of the books of the Southern Ice Company, from the time that Hart and McDonald took hold of those companies. The other expert was E. J. Hathorn, whom McDonald brought to this city, and who represented that gentleman. After a good deal of testimony, and after several reports had been prepared by them, these two experts were directed to cooperate in an examination of the books, and, if possible, present a report which would show McDonald’s relations to the ice business in which he and Hart were interested, as it appeared from the books. The result was a report, agreed upon by them, which reads as follows, to-wi't:
“An examination of the books of the Municipal, Southern and Consumers’ Ice Companies, by Messrs. Duncan and Hathorn, shows that, exclusive of the $5,000.00 stock of the City Delivery Co., there is due, after allowing all credits for dividends and commissions, to R. T. McDonald, the sum of $254,740.91; with the addition of the City Delivery stock, $6,271.03, the amount is $261,011.94; and, adding the $25,000.00 “Municipal”, the amount due McDonald is $290,427.76. This includes interest to March 1, 1898, and includes an item of Delavergne notes to which McDonald was subrogated, $31,527.80, inclusive of interest.
(Signed) “E. J. II. C. W. D.”
“The L. Thalman note is included in the balance of $261,011.94”.
As the original suit was brought by Hart for the recovery of the stock of the Southern Ice Company in kind, and as the prayer of the original petition has been reiterated in those subsequently filed, we shall not, at this time, concern ourselves with the question as to what Hart’s rights may be in case he abandons his claim to the stock, but shall proceed, at present, upon the theory that his heirs stand upon the demand for its recovery, in kind.
In arriving at the balance of $261,011.94, in favor of McDonald, the accountants credited him with $118,127.87, expended in connection with the Southern Ice Co. This amount includes, as we understand it, the one-half of the first payment, of $25,000.00, which was reimbursed by *1700 Hart, and which with interest calculated to March 1, 1898, amounts to $16,798.16; and also includes Hart’s proportion of the dividends and commissions collected by McDonald from the City Delivery Company, amounting to $17,572.38. These two amounts, aggregating $34,370.54 must, therefore, be deducted, for the purposes of a settlement between Hart and McDonald, from any balance appearing to the credit of the latter; and, the deduction being made, the $261,011.94 is reduced to $226,641.40. McDonald is also credited with the value of the stock in the City Delivery Company, whereas ther'e is nothing to show that he paid anything for it and the ¡circumstances under which it was held render it more than probable that he paid nothing. Deducting its supposed value, $6,271.01, the balance to his credit is reduced to $220,-370.39. A still further reduction of $47,731.79 is to be made by reason of a credit to that amount which McDonald received in his purchase of the plant of the Consumers’ lee Company, when the same was sold by the receiver, bringing the balance in favor of McDonald down to $172,-638.60; and, finally, the balance, thus arrived at, must be increased by the amount of the “Blymer” judgment, together with the attorney’s fees and costs (being obligations for which Hart and McDonald were liable in solido, and which were paid by McDonald), amounting to $37,300.85. With these alterations of the figures as presented by the experts, McDonald appears to have paid out, for the purposes of the ice business, in which he and Hart were to share alike, $209,939145 more than Hart, and the latter is, therefore, liable for one-half of that amount, or $104,-969.72.
If, however, Hart should conclude to abandon his claim to the Southern Ice Company stock, he should not be charged with any disbursements made on that account, and it would become necessary to deduct from the balance shown in favor of McDonald, on ice transactions, not only the $34,370.54 which has been deducted, but the entire $118,127.87, with which he is credited on account of the Southern Ice Company, and this would reduce the ultimate balance in his favor, for the purposes of the present question, to $63,091.01. This conclusion is, of course, predicated upon the assumption that the stock is as valuable now, as it was when it was bought, because, if there has been a loss by its depreciation, Hart would have to bear his proportion of it.
*1701 XII.
The Sewerage Matter.
An ordinance was adopted by the city of New Orleans granting to A. A. Woods a franchise, or privilege, for the construction, and maintenance, for fifty years, of a system of sewers, which ordinance was followed by a contract, between the city and Woods, whereby the latter accepted the grant and assumed the obligations [contained in the ordinance, and imposed by it. Woods, it appears, stood for M. J. Hart in the matter, and the latter organized the New Orleans Sewerage Company, to which Woods transferred his rights, under said ordinance and contract, in consideration of the issuance to him of $1,500,000,00 of full paid stock of the company, which stock, it is admitted, belonged to Hart, though issued in the name of Woods. The whole capital stock of the company was $2,000,000.00, and the remaining $500,000.00 was also the property, or under the control, of Hart. The company, thus organized, gave Hart the contract to build the sewers, and agreed to pay $2,500,000 for the work, of which $500,000 was to be paid in full paid stock of the company, and $2,000,000 in its bonds, secured by mortgage. Hart, at that time, controlled a concern sometimes known as the “Cullom Construction Co.”,- and sometimes as the “New Orleans Construction Co.”, in which he owned 75 per cent, of the stock, and one Cullom is said to have owned the balance, though Hart speaks of Cullom as a mere employe. Through the medium of this company, or rather, using its name, which was practically all there was of it, Hart undertook to do the work for which he had contracted with the Sewerage Company. He expended a great deal of money and did very poor work, and it was decided to call foil bids, and to obtain a contractor who could do better; and the contract was, in that way, turned over to Stewart and McDermott, who went on for a while, losing money, as it is supposed, on their contract, until they finally abandoned it; whether with, or without, just cause, being a matter which is the subject of litigation. After that, no attempt was made to continue the work. Later on, a receiver was appointed; the holders of bonds, which had been sold or hypothecated to raise money, went into court, and the whole concern, including the work done, was sold and adjudicated to them or their representatives. M. J. Hart claims that this disastrous result was attributable to the failure of McDonald to furnish funds, as had been agreed in a personal *1702 contract between them, and that he, Hart, has been damaged to the extent of $500,000.00, for which he prays judgment. McDonald claims that he furnished more money than his contract called for; that the money furnished was wasted and misappropriated by Hart; that a heavy loss has resulted to him, and that Hart, as his partner in the matter, is liable for one-half of such loss. He also claims that, whilst the business was carried on in the name of M. J. Hart, it was really that of Judah Hart, but he does not insist upon this, and there is; an agreement in the record under which the court may render judganent against, or in favor of, Judah Hart or M. J. Hart, as the facts disclosed may warrant.
The ordinance, and the contract with Woods, were adopted, and entered into, in 1892, and, in January, 1894, McDonald and Hart entered into a written contract upon the subject of McDonald’s supplying funds with which to carry on the work. The present point of difference lies in the fact, that ITart claims that; under the contract as made and as subsequently modified, McDonald was to “finance” the entire enterprise — using the bonds of the I company as collateral security; whilst McDonald claims that he undertook onjy to furnish $180,000.00 during the year 1894, with which to pay one-half of the cost of the first section of the work (the estimates for which contemplated that it could be finished within that time, and at a cost of something less than $360,000.00) and that Hart was to pay the other half 'of such cost.
The original contract in question is' ¡referred to, in the briefs of counsel, as document marked “IT. 8”, but we have been unable to find it in the record. The oral testimony as to the terms of' said contract, is, however, very full, and there is considerable written evidence, more or less pertinent, so that, for the purposes of the conclusion which we have reached, the document “IT. 8” may be dispensed with.
Dealing, first, with Hart’s claim for damages; we find that McDonald raised $244,485.36 for the purposes of the sewerage work, the major part, if not the whole, of which, he obtained by hypothecating, or selling, the bonds of the sewerage comx)any, which were furnished him for that purpose.
This money, with the exception of about $40,000.00 paid to Stewart and McDermott, the last contractors, was paid to Hart, for the work done by him through the Construction Company. When the whole amount had been paid out, including that paid to Stewart and McDermott, it was found that, of the work embraced in the first section, the *1703 estimated cost of which was $357,000.00, not more than one-third had been done, and that the work done was not worth over $100,000.00; so that, it having cost (in round figures) $240,000.00 to do one-third of the work, which was expected to have cost $357,000.00, it was not unreasonable to suppose that the other two-thirds wduld cost in the same proportion, and that the first section would therefore cost $714,000.00 instead of $357,000.00, and that the entire work would cost, at that rate, in the neighborhood of $3,000,000.00, instead of $1,400,000.00 or less, as contemplated by Hart and McDonald when they entered into the agreement with regard to raising funds.
Under these circumstances, and, as the work done by Hart, and under his supervision, at‘ a cost exceeding $240,000.00 was not worth, when done, more than $100,000.00, McDonald could not have been expected to go on raising money and making advances. And this would be the case, whether the fault -lay with Hart or not. Eor it would be unreasonable to hold that where two individuals enter into a contract upon the basis of an expenditure of $1,500,000.00, and they subsequently find out that they were mistaken in their estimates, and the work will cost $3,-000,000.00, or $6,000,000.00, the one can hold the other for damages for a refusal to go on.
This claim, as made by Hart, is the more unconscionable as it appears, from his own testimony, not only that he had never put a dollar into this sewerage business, but that, in one way or another, he had absorbed a large proportion of that raised by McDonald, and that the $500,000.00 damages claimed by him consists of profits, which he expected to realize, if the enterprise had( been carried to a successful issue.
Turning now to McDonald’s claim; itds neither more nor less than a claim made by one partner upon his co-partner, to compel the latter to pay his share of a loss sustained in a partnérship transaction. It would be impossible to adjust a matter of this kind in any other way than by dealing with the transaction as a whole, ascertaining the entire loss, and dividing it among the partners. The evidence makes it clear that a heavy loss has been sustained by some one, and that Hart has contributed nothing. It is not made clear, however, that the whole loss has been sustained by MbDonald, nor are we able to determine, after a diligent effort to do so, what loss he has sustained. Comparatively little money was advanced by him until the bonds of the company, upon which he was expected to raise it, were put in his hands, and the par *1704 value of the bonds delivered to him exceeded, by over $100,000.00, the amount furnished by him to the company. Whether all of these bonds were used by him as collateral security for loans for which he made himself liable, or whether a part were so used and the remainder negotiated, or sold outright, is not made clear. In other words, he obtained negotiable securities to enable him to raise the money to be furnished, and the details of the transactions in which they were used for that purpose, and the amount actually paid out by him, or for which he is liable, are matters which we do not find sufficiently disclosed to entitle him to a judgment.
Summary.
The calculations of interest have been made upon the same basis by the parties, respectively, but, with regard to the items claimed by Judah Hart, they have been brought up, in the pleadings, only to January 20, 1897, whilst, upon McDoliald’s claims, the interest has been calculated up to March 1st, 1898. In order to equalize matters, as far as practicable, we have added interest, computed in the manner accepted by the parties throughout their transactions, to the items allowed Hart, from January 20th, 1897, to March 1st, 1898; from which date interest will be allowed both ways, at 6 per cent, per annum. Thus, the items claimed by Hart, in “Exhibit A”, are increased for the purposes of the decree, by the addition of the interest from January 20th, 1897, to March 1st, 1898, one year and thirty-trine days, as follows, to-wit: Item No. 2, from $2,456.53 to $2,623.05; item No. 4, from $5,813.15 to $6,-703.96 (by the addition of interest at 5 per cent, per annum from February 5th, 1895, to March 1st, 1898, the interest being allowed, as claimed); item No. 6, from $4,521.69 to $4,828.24; item No. 7, from $16,488.99 to $17,567.48; item No. 9, from $6,800.00 to $7,696.66 (adding interest from July 1st, 1896, to March 1st, 1898, computed every six months at 6 per cent.) ; making the total due to Hart, as of date March 1, 1898, $38,819.29; the balance due to McDonald being $104,969.72, provided Hart insists upon his ddmand for the recovery of the stock of the Southern Ice Oo.; and $63,091.01 should he abandon that claim.
For these reasons, it is ordered, adjudged and decreed that the judgment appealed from be affirmed in so far as it rejects the demand of Maurice 3. Hart for damages alleged to have been sustained in connection with the sewerage business; and that, in all other respects, said *1705 judgment be annulled, avoided and reversed, or amended, as follows, to-wit: In that there now be judgment in favor of Samuel J. Hart and Mrs. Helen Hart, wife of Maurice J. Hart, as heirs of Judah Hart, deceased, and against Harry H. Hall, administrator of: the succession of Ranold T. McDonald, deceased, in the sum of $38,S19.29, with interest thereon at the rate of 6 per cent, per annum from March 1st, 1898, until paid; rejecting the demand of said administrator as against Judah Hart, and his, said heirs, for monies advanced and damages sustained in connection with the sewerage business; and in favor of Maurice J. Hart, rejecting, as in case of non-suit, the demand of said -administrator against him, said Maurice J. Hart, for monies advanced and damages sustained in connection with said sewerage business. It is further ordered, adjudged and decreed that there be judgment in favor of Harry H. Hall, administrator of the succession of Ranold T. McDonald, deceased, and against Samuel J. Hart and Mrs. Helen Hart, wife of Maurice J. Hart, in the sum of $104,969.72, with interest thereon at the rate of 6 per cent, per annum, from March 1st, 1898, until paid.
It is further ordered, adjudged and decreed that the judgment herein rendered in favor of said Samuel J. Hart and Mrs. Helen Hart, for $38,819.29 and interest, be held to be compensated and extinguished by the judgment herein rendered, in favor of Harry H. Hall, administrator, for $104,969.72 and interest, and that said last mentioned judgment be also held to be compensated and extinguished, pro tanto, so that the amount for which execution may issue thereon shall be $66,-150.43, with interest, as heretofore specified.
It is further ordered, adjudged and decreed that the said Samuel J. Hart and Mrs. Helen Hart be held entitled to recover from said Harry H. Hall, administrator, two hundred and seventy shares of the capital stock of the Southern Ice Company of New Orleans, being the one-half of five hundred and forty shares of said stock, now, or lately, standing in the name of Ranold T. McDonald, and that the saíne be delivered to them, provided that, within sixty days from the date at which this judgment shall become final, and before the delivery of said stock, the said Samuel J. Hart and Mrs. Helen Hart shall pay to said administrator the sum of $24,693.39, with interest thereon, at the rate of 6 per cent, per annum from March 1st, 1898, until paid.
It is further ordered, adjudged and decreed that, in the event that said Samuel J. Hart and Mrs Helen Hart shall fail to make said pay *1706 ment within the timo specified, they shall forfeit all rights with respect thereto, and said stock shall be held to belong to the estate of Ranold T. McDonald; but, in that event, the judgment in favor of Harry IT. Hall, administrator for $104,969.72 shall be held to be reduced to $63,091.01, and, save with respect to the difference between said amount, of $63,-091.01, and $38,819.29, to-wit, the sum of $24,271.72, there shall be a stay of execution on the judgment in favor of said administrator until the expiration of the sixty days allowed the defendants in said judgment to determine whether they will take the stock claimed by them, or abandon their claim thereto.
It is further ordered, adjudged and decreed that in all other respects, save as specifically determined by this decree, the demands of the parties, respectively, be rejected; that the costs of the appeal be paid by the appellees and that the costs of the lower court be paid by the parties to this litigation in equal proportions; that is to say; one-third by Samuel J. Hart and Mrs. Helen Hart; one-third by Maurice J. Hart; and one-third by Harry II. Hall, as adkninistrator of the succession of Ranold T. McDonald, deceased.
Rehearing refused.