HENRY G. RUNKLE vs. ALBERT C. BURRAGE & others.

SAME vs. SAME.

Suffolk.    January 22, 25, 1909. — May 20, 1909.

Present: KNOWLTON, C. J., MORTON, HAMMOND, LORING, & BRALEY, JJ.

*Contract*, Rescission. *Equity Jurisdiction*, Rescission of contract, Accounting.

In a suit in equity for a rescission of a contract under which the plaintiff paid money
to the defendant as an investment in a certain enterprise, and for an accounting
as to the money, it appeared that the only agreement or contract made was that
the plaintiff, by his subscription to the enterprise, became interested with the
defendant and some other persons whose names he did not know in an " under-
writing syndicate for the flotation of certain copper properties in Arizona and
New Mexico." The defendant acted as treasurer and manager of the syndicate
and the plaintiff paid in his money in reliance upon the defendant's ability to
manage and conduct a copper mining enterprise. The defendant failed to exer-
cise reasonable care and prudence in the matter and the enterprise was a failure.
There was no evidence of dishonesty or of fraud on the part of the defendant.
*Held*, that the bill should be dismissed, since there was no ground for rescission
of the contract.

In the absence of fraud, nothing less than conduct on the part of one party to a
contract that amounts to an abrogation of it, or takes away its foundation,
gives the other party to the contract a right to rescind it.

TWO BILLS IN EQUITY, filed in the Superior Court for the
county of Suffolk on September 28, 1903, and April 18, 1905,
respectively, and afterwards repeatedly amended, seeking a re-
scission of certain agreements under which the plaintiff and per-
sons whose claims were assigned to him placed money in the
hands of the defendants for investment, and for an accounting
as to such money.

The cases were referred to James D. Colt, Esquire, as master
and were heard together by him. The material facts reported
by him are stated in the opinion. The cases were heard on
exceptions to the master's report before *Richardson*, J., who
reserved them for determination by this court.

*W. I. Badger*, (*W. H. Hitchcock* with him,) for the defendants
Burrage.

*H. Albers*, for the defendant Lawson.

*C. F. Choate, Jr.*, (*W. R. Barbour* of New York with him,) for
the plaintiff.

KNOWLTON, C. J.   These are two suits in equity brought against Albert C. Burrage, his brother Charles D. Burrage and Thomas W. Lawson, for an accounting, and to recover moneys subscribed by the plaintiff and others towards an enterprise in the sale or management of mining properties alleged to have been undertaken by the defendants.   The first suit was brought to recover money subscribed by the plaintiff personally, and the second to recover money subscribed by others who have assigned their interests to the plaintiff.   The subscriptions represented in the two suits amount in the aggregate to $406,125, which sum, with interest from May 10, 1899, the plaintiff seeks to recover.   The subscriptions were made through one Dickey who was a close and intimate friend of A. C. Burrage both in social and business relations.   A part of the master's finding is as follows :   " On that day (April 24, 1899) he (Dickey) met Burrage alone by appointment at the office of H. H. Rogers in New York. At that interview Burrage mentioned that Dickey and some of his friends had asked to be allowed to participate in some of the new enterprises which he was inaugurating ; that he now had options or agreements for options on a number of copper properties in Arizona and New Mexico, and that he was about to put them together into a new company to be capitalized at $10,000,000 or $15,000,000, and to be called Arimex, a name derived from the words Arizona and New Mexico ; that he was willing to let Dickey and his friends take part in the enterprise.   He stated that the properties would cost several million dollars, and that Messrs. Rogers, Rockefeller, Daly, Lewishon, Lawson and himself would be the parties interested and would be subscribers ; but requested Dickey not to mention their names in connection with the enterprise.   He spoke of the Santa Rita mine and the Sisson properties as the ones he intended to consolidate, stating that they were of great value.   He mentioned the fact that one of Sisson's options expired on May first, that $225,000 was needed to take it up ; that it would be inconvenient to raise this money himself, as he was at that time heavily committed to other enterprises, and that he would allow such of Dickey's friends as wished to become interested in the new enterprise to subscribe and contribute, as a part of the amount to be ultimately subscribed, the sum of $225,000, which was the sum then needed to take up the

two hundred and twenty-five thousand dollar option. He stated
to Dickey that the Arimex was not to be a part of the great
copper consolidation which was shortly to be made public and
which would be called the Amalgamated Copper Company, and
for which he had been getting together properties in Montana
when Dickey was there with him in January, 1899. This was
the first time Dickey had heard the name 'Amalgamated,' and
Burrage requested him not to mention it to any one. The fore-
going is the substance of the interview. Nothing else of impor-
tance was discussed. Dickey at once went to his friends in
Baltimore, Philadelphia, New York and elsewhere, and proposed
to them that they should subscribe to the enterprise. He told
them that Burrage was behind it, that it was a big copper prop-
osition, and that Burrage had allowed him to obtain subscriptions
to a limited amount, and that he was not at liberty to say any-
thing about the properties or their whereabouts. In a very
short time the $225,000 was subscribed, and Dickey telephoned
Burrage, asking to be allowed to obtain subscriptions to the
amount of $350,000. Permission was given, and Dickey tele-
phoned the next day for the right to subscribe $500,000. Again
permission was given, this time with some reluctance. In four
days at the outside, Dickey had obtained, on the very meagre
information above mentioned, subscriptions to the amount of
$500,000, and this large sum of money was deposited to his
credit in the Liberty National Bank."

At the time of this interview Burrage expected that the Santa
Rita mine would be included with the Arizona properties when
the enterprise was established, but Dickey did not mention the
Santa Rita mine to any of his subscribers. The purchase of the
Santa Rita mine was not concluded until June, 1899. It was
never included with the Sisson properties, and still remains an
independent company.

Some of the testimony of the witnesses as to the representa-
tions on which the subscriptions were made is as follows : The
plaintiff testified that Dickey told him : " We have a copper
proposition now which is better than anything I have been
connected with, and will give more money than any enterprise
with which I have been connected. I am permitted to let a few
people into this enterprise, and will be glad to have you in it.

He said, I am not able to go into the details, but my expectation is that as soon as these properties are working and showing a profit, they will be taken into the Amalgamated Company." Dickey testified: " I stated very little. I simply stated to Mr. Runkle that Mr. A. C. Burrage was going to put these copper companies together and asked him if he wanted to make a subscription to it." Pritchard, a subscriber, testified of Dickey's statement: " The substance of it was that Mr. Dickey, through his friend Mr. Burrage, had an opportunity to underwrite a venture which was to develop mining properties in Arizona and New Mexico, and if the amount was larger than he cared to put in himself, he was at liberty to take subscriptions from some of his intimate friends, and on those representations, that the properties were to have the personal oversight of Mr. Burrage and his associates, I ventured $5,000." Dickey, referring to the subscribers whom he personally saw, testified as follows: " I told these gentlemen that Mr. Burrage was putting together some copper properties which he was to make into a large company and bring out; that he had given me a limited amount to subscribe among my personal friends, and by his request I was asked not to mention the names of any one connected with him in this enterprise, or even mention the name which he had given me for the name of the properties. That is the sum and substance of the conversation." This testimony fairly represents the only arrangements under which the several sums were subscribed. They were paid over to Dickey and " it was suggested by the defendant, A. C. Burrage, that until the company could be permanently organized the enterprise should be known as. the Arimex syndicate, to be composed of all persons in interest, including Dickey's subscribers, and of which Charles D. Burrage should be the treasurer, and this was done. The syndicate was formed to take over the Sisson properties and such other properties as should seem desirable, to solicit and receive subscriptions, give receipts, pay out money for the enterprise, and do everything necessary to be done prior to the formation of the permanent company." Neither of the defendants was a subscriber, but A. C. Burrage " was the moving spirit in the enterprise. He determined the properties which were put into the permanent company, he advanced money, selected or

supervised the election of the officers, passed upon all papers of importance, and advised and directed in the conduct of the enterprise." On April 28, 1899, $335,000 of this money was lent to Sisson by Charles D. Burrage as treasurer of the syndicate, and a conveyance of Sisson's mining properties was taken as collateral security, with an option to purchase them at a stated price and to treat the money lent as the first payment. Afterwards the purchase was consummated, and $206,000 more was paid Sisson in July, 1899, of which $165,000 was the balance of the subscriptions made through Dickey and $41,000 was advanced by A. C. Burrage. Burrage received no note or other evidence of indebtedness, either from the Arimex syndicate or the Arimex Company for this advance, or for the more than $30,000 which he expended in the purchase of the Angang mine that was joined with the Sisson properties in the same enterprise, and was afterwards controlled by the Arimex syndicate, and later by the Arimex Company. Substantially all sums borrowed since the organization of the Arimex Company in August, 1899, have been borrowed from the defendant, A. C. Burrage. On September 14, 1904, he had lent the company $269,157, which was represented by notes of the company. The amounts borrowed from him since that time were not disclosed by the evidence.

On May 10, 1899, receipts for the several sums which had been contributed by Dickey's friends, indorsed by Dickey, were sent to them in the following form:

"Boston, May 10, 1899.

"Received of Charles H. Dickey      dollars, being in full of his subscription of      dollars to an underwriting syndicate for the flotation of certain copper properties in Arizona and New Mexico.

"Charles D. Burrage, Treasurer."

On August 4, 1899, the Angang Copper Company, the Oxide Copper Company and the Arimex Consolidated Copper Company were organized under the laws of New Jersey. The capitalization of the first of these corporations was $1,000,000, and that of the second and third was $5,000,000 each. The Table Mining Copper Company, previously organized under the

laws of Arizona, was capitalized at $10,000,000. The Arimex Company is a holding company which acquired most of the capital stock of the other three companies, and these three companies acquired the Sisson properties held by the syndicate, and the Angang property, which was a mine in Mexico. In January, 1901, after very extensive and costly advertising in different cities, there was an attempt to sell in the market a large amount of treasury stock of the Arimex Company, but this attempt failed utterly. In February, 1901, a letter was sent by Dickey, the president of the Arimex Company, to the subscribers, informing them of the failure of the attempt to sell the stock, and saying that it was thought best to terminate the syndicate pool by sending to subscribers the amount in stock in the Arimex Company to which they were entitled, in return for their trust certificates. Stock was therefore sent in double the amount of the several subscriptions, reckoning the stock at its par value, and was accepted by most of the subscribers in exchange for their trust certificates.

There were no profits from the working of the mines owned by these corporations, and considerable sums were spent in the development of some of them. In 1901 and later, requests were sent by subscribers to the defendants for information in regard to their investments, without obtaining satisfactory answers, and after a tender by the plaintiff to the defendants of the shares of stock which the subscribers had received, these suits were brought.

The plaintiff contends that the arrangement between the subscribers and the defendants has been rescinded for active or constructive fraud, or for a breach of the contract, and asks for a repayment of the amounts subscribed, with interest. Additional findings by the master were as follows: "I find that no one of the defendants ever received any profit or money from, or stock in the enterprise; but on the contrary, A. C. Burrage as above stated, advanced several hundred thousand dollars to the company for development work, exploration work, expenses, etc. All the money, other than the $500,000 received from Dickey's friends, the sale of a few shares of the company's stock, and a comparatively small sum received from ore at the Oxide and Angang properties, came from A. C. Burrage. At the time the

properties were purchased, he believed them to be very valuable, and there is no evidence that he had changed his belief prior to the bringing of these suits. At the inception of the enterprise, when Sisson first came to Boston, Burrage decided to take up the Sisson properties, with the intention of forming a large mining company to own them and possibly other copper properties. He consulted with Mr. Lawson, with whom he was then co-operating in the formation of the Amalgamated Copper Company, and it was understood between them that Burrage, as an experienced man in the investigation of copper properties and the formation of copper mining companies, should investigate the Sisson properties, and, if satisfied as to their value, form a company to purchase them. Lawson gave his advice when it was asked, but did not take any active part in passing upon the value of the properties or the formation of the company. He took charge of the public offering of stock in the proposed company. Neither he nor Burrage subscribed any money to the enterprise. I do not find that any definite arrangement was made whereby either Lawson, the Burrages or Dickey, were to profit by the undertaking, in case it was successfully floated and the public purchased the stock ; but it was the expectation of each of them to profit largely by the enterprise if it turned out a success. . . . The defendants Burrage failed to exercise prudence or good judgment in the purchase of the properties that went into the Arimex Company, and they failed, when requested, to give the plaintiff and his assignors the information concerning the properties to which they, as subscribers, were fairly entitled. . . . The defendants Burrage did not exercise reasonable care and prudence in ascertaining the character, condition and value of the properties acquired from Sisson, before using, investing and expending the funds subscribed by the plaintiff and his assignors."

The fundamental question in the case is, What was the contract or arrangement between the subscribers and the defendant, A. C. Burrage? There is no contradiction in the evidence bearing upon the question. Burrage was planning an enterprise which had not taken definite form, and he gave the subscribers an opportunity to take a part in his undertaking. The nature of the undertaking was stated only in the most general terms.

The subscribers were not informed where the property was, or who besides Burrage was likely to be interested in it. Dickey, for himself and as the representative of Burrage, made known to the subscribers the opportunity that was given them. They acquired no rights except such as resulted from joining in the enterprise as it was in fact, and as it was represented to them. There is no ground for a contention that there was any intentional or material misrepresentation of fact in the statements in regard to the enterprise. Seemingly, both Burrage and Dickey were then very hopeful in regard to it. In making the proposition, Dickey was requested not to mention the names of persons who would be with Burrage. In referring to the Santa Rita mine and the Sisson properties, Burrage only spoke of his intention, and did not bind himself to procure either of them. He was not then the owner of either of them. They were not mentioned by Dickey to any subscriber. While the subscribers had an interest, and perhaps might have had a voice, in the further promotion of the plant as soon as they were accepted as members of a contributing syndicate, it was evidently expected that Burrage would be the principal manager of the business. The master has found that the subscribers " paid their money in reliance upon the ability of A. C. Burrage to manage and conduct a copper mining enterprise," and that they left everything to him, taking no action in the business until long after the certificates of stock were sent them in exchange for their trust certificates in the syndicate.

It was the legal duty of Burrage to act fairly and in good faith in dealing with the interests of the subscribers as joint owners in the business. But in being admitted as sharers in an enterprise which he was conducting primarily for his own profit, it was an implied understanding of the parties that, so far as he acted without objection, he was to exercise his own judgment for the common good. It was his enterprise, in which they were to share, and he agreed that so far as he managed it, he would act honestly and in good faith. If he was called upon to use any more skill, care or judgment, in the matters in which they were jointly interested, than he thought sufficient for the protection of their common interests, which we do not decide, his omissions in that particular are immaterial in the decision of

this case. The finding of the master that he did not exercise reasonable care and prudence in ascertaining the character, condition and value of the properties acquired from Sisson, before using, investing and expending the funds subscribed by the plaintiff and his associates, does not establish a right on the part of the subscribers to rescind the contract and reclaim their money.

The contention of the plaintiffs that there was a breach of the contract, or a lack of good faith on the part of the defendants, in the failure to include in their enterprise the Santa Rita mine, or in the final determination of what properties should be included, or what price should be paid for them, is not supported by evidence. In these particulars the arrangement was indefinite, and the determination was left to Burrage and his associates. The master has found that he thought the selected properties very valuable, and there is every reason to believe that he thought the enterprise would be successful. The fact that he invested a large amount of his own money in it, an amount much larger than that contributed by any of the subscribers represented by the plaintiff, is strong evidence in his favor.

Nor does the evidence show dishonesty or bad faith on the part of the defendants in procuring the organization of corporations to hold the property. The fair inference is that the plaintiff and the other subscribers expected in the beginning that the enterprise would be conducted in this way. Very likely a sale of stock in the market was expected by the subscribers, as a probable source of great profit. The dealings between the syndicate and these corporations, and between the Arimex Company and the other corporations is not shown to have been prejudicial to the stockholders in the Arimex Company. In the dealings of the several corporations with one another and with the members of the syndicate, it does not appear that either of the defendants acted dishonestly, or in bad faith towards the subscribers. Nor is it shown whether the ownership of the subscribers in the Arimex Company, represented by their certificates of stock, is all that they should have received under their arrangement with A. C. Burrage. So far as appears, most of the other stock has never been issued, and is held by the corporation as contemplated stock. The plaintiff's claim has not been presented with a view

to showing whether, if the conduct of the defendants in organizing the corporations was authorized and binding, the subscribers have received such interests in the corporations as they were entitled to have. If entitled to relief in this particular by way of accounting or otherwise, it could hardly be obtained without making the Arimex Company a party to the suit, and perhaps the other corporations also.

The report of the master shows that A. C. Burrage was willing to allow his friend Dickey and Dickey's friends to share with him in an enterprise from which he expected large profits for himself and them. As he was then engaged in other large enterprises, he wanted the help of associates who would subscribe capital towards the purchase of some of these mining properties. He was deceived by Sisson, who presented statements and furnished recommendations which so far won his confidence that he failed to make such thorough, independent investigation as reasonable care and prudence required. He prosecuted the enterprise substantially as originally contemplated, but the mining enterprise turned out to be of little value, and the result was a disastrous failure. Subsequently he unreasonably and improperly refused the request of the subscribers for information of the particulars of his action.

In the general management of the business, until the time came for determining how many shares of the stock and what part of the property the subscribers were entitled to receive, Burrage was not acting in matters in which he had a personal interest adverse to the subscribers, in such a way as to subject him to the strict rule which applies to those acting for themselves in the business of others to whom they stand in a fiduciary relation. In a sense he was acting as their agent and trustee in matters in which he and they had a common interest. They were *quasi* partners with him in the enterprise, and his relation to them was analogous to that of a partner to his copartner. It is not suggested that his advances to the Arimex Company by way of loans were not made in good faith, with a view to the best interests of the corporation.

If it were assumed in favor of the plaintiff that Burrage was under a legal duty to use ordinary care in the management of the business, so that he would be liable in damages for neglect

in that particular, this would not be a ground for a rescission of the contract between them. *Ballou* v. *Billings*, 136 Mass. 307. *Weintz* v. *Hafner*, 78 Ill. 27. *Luce* v. *New Orange Industrial Association*, 39 Vroom, 31. *Moore* v. *Cross*, 87 Texas, 557. *Harrington* v. *Rutherford*, 38 Fla. 321. 24 Am. & Eng. Encyc. of Law, (2d ed.) 619, and cases cited.

In the absence of fraud, nothing less than conduct that amounts to an abrogation of the contract, or that goes to the essence of it, or takes away its foundation, can be made a ground for rescission of it by the other party. In this case there is no evidence of fraud in the inception of the contract, or in the management of the business which was conducted for the joint proprietors. Whether the defendant A. C. Burrage and his brother C. D. Burrage, who acted under his direction, have dealt fairly and in good faith with the plaintiff and the other subscribers in assigning them the stock which was sent them as their share in the property, the evidence does not enable us to determine. Their action in this part of the business was not binding on the subscribers, and the evidence indicates that the acceptance by the subscribers of the shares of stock was not made under such circumstances as to be binding upon them. But no question of this kind has been presented to us, and we need not consider it. Our decision is without prejudice to the presentation of this question in another suit.

The evidence does not connect Lawson with the subscribers in such a way as to show a legal liability of any kind. Upon the cases before us the entry in each case must be

*Bill dismissed.*