No. 24,727.

THE FIRST NATIONAL BANK OF VAN BUREN, ARK., and W. T. MAXWELL, Bank Commissioner of the State of Arkansas, *Appellees*, v. N. N. HOOVER and LUCY L. HOOVER, his wife; JOEL WOOD, and the LEOTI LAND COMPANY, *Appellants*.

SYLLABUS BY THE COURT.

1. CONTRACT — *Joint Adventure — Between H· and M to Handle Peaches — M to Buy, and H to Sell—Money Borrowed by M to Buy Peaches a Private Debt of M—Not a Joint Debt of H and M.* H and M undertook to handle peaches during the peach season and by their agreement M was to buy the peaches and H was to look after selling them and at the end of the selling season any profits or losses were to be shared equally. *Held,* money borrowed by M on his own account for the purchase of peaches was the debt of M and not the joint debt of H and M.

2. SAME—*Material Alterations in Real-estate Mortgage—Mortgage Nonenforceable.* H executed a real-estate mortgage to secure his note to a bank ·and sent it to the cashier. At the time he did not have with him the exact amount of his note, the due date, nor the rate of interest and left blanks for those items and he wrote the cashier to fill in the blanks before filing it for record. The cashier filled the blanks according to H's instructions and afterwards, and without the knowledge or consent of H, altered the mortgage by increasing the amount and so as to show that it secured not only H's note to the bank, but also a note which the cashier had given to the bank. *Held,* that the alterations rendered the mortgage nonenforceable.

3. SAME—*Service by Publication—Voluntary General Appearance—Jurisdiction of Trial Court.* Where a suit was filed upon a promissory note and to foreclose a mortgage and the defendant, without objecting to the nature of

the process upon him, filed an answer setting out all his defenses and the case was tried on its merits, *held,* that the court had jurisdiction to render any judgment proper under the pleadings and evidence without regard to the nature of the process served upon the defendant.

Appeal from Wichita district court; ROSCOE H. WILSON, judge. Opinion filed October 6, 1923. Affirmed.

*H. A. Russell,* and *Stanley L. Smiley,* both of Scott City, for the appellant.

*W. C. Dickey,* of Leoti, and *E. 'L. Matlock,* of Van Buren, Ark., for the appellees.

The opinion of the court was delivered by

HARVEY, J.: This is a suit to foreclose a mortgage. The case was tried to the court, who made exhaustive findings of fact as follows:

"1. N. N. Hoover and E. E. Morris, in the spring of 1919, entered into an agreement whereby Morris was to purchase peaches in the vicinity of Mountainburg, Arkansas, and Hoover was to market such peaches, and profits and losses were to be divided equally between them.

"2. That at such time, and until about June 1, 1920, Morris was cashier of the Bank of Mountainburg.

"3. Morris was cashier of the Bank of Mountainburg, from the time of its organization and for several years had on the books of said bank what he termed a 'peach account.' It was his custom to draw checks of the bank for the purchase of peaches, and charge such checks to such account and to credit such account with the proceeds of the sales. The purchase of the peaches in 1919 were handled in this same manner.

"4. There was no agreement by which Hoover was to furnish any capital for the purchase of the peaches, and he did not know how the purchases were financed by Morris.

"5. At the end of the season the 'peach account' showed an overdraft of $6,800.

"6. Morris and Hoover had a meeting in September, 1919, at which time it was ascertained that the losses on the peach business amounted to $6,800.

"7. On September 18, 1919, Hoover executed his note to the Bank of Mountainburg for $3,400, to cover his half of the losses. Morris, as cashier, agreeing that the bank should loan Hoover that amount and the loan was approved by the Discount Committee of the bank. Morris, on the same day, executed his note to the Bank of Mountainburg for $3,400.

"8. The proceeds of said notes were applied on the overdraft for $6,800 on the 'peach account.'

"9. Later, Morris notified Hoover that the Bank Commissioner was insisting on security for the two notes; that he had given security for his note, and asked Hoover to execute a mortgage on his Kansas land, to secure his note.

"10. Hoover, on October 12, 1919, executed a mortgage on the land in question, leaving blank the amount of the consideration and the description of the note secured as to the rate of interest and the date of maturity. The

mortgage as executed by Hoover recited: that it was given to secure 'one promissory note dated the 18 day of Sept. 1919 payable —— after date, with interest at the rate of —— per cent per annum from date, being made by the party of the first part and payable to the party of the second part.'

"11. Such mortgage was sent by Hoover to Morris with these instructions: 'There are several blanks in the mortgage which I have not the information with me to fill, but you can easily fill them in before filing it for record.'

"12. Morris filled out the mortgage to secure the $3,400 note of Hoover's and afterwards altered the mortgage so that it secured both the Hoover and Morris notes.

"13. The name of E. M. Hoover was added to the mortgage after its delivery to the Bank of Mountainburg, and the acknowledgment changed to show that E. M. Hoover was the wife of N. N. Hoover.

"14. E. M. Hoover was not the wife of N. N. Hoover, and the wife of N. N. Hoover did not sign or acknowledge the mortgage.

"15. The Hoover note was negotiated to the First National Bank of Van Buren, before maturity, in the due course of business, and the mortgage executed by Hoover was at such time delivered to the First National Bank of Van Buren.

"16. No assignment of the mortgage to the First National Bank of Van Buren has been recorded in the office of the register of deeds of Wichita county, Kansas.

"17. The Hoover mortgage was recorded in the office of the register of deeds of Wichita county, Kansas, on November 20, 1919.

"18. The Hoover note was executed in the state of Arkansas, and the mortgage was executed in the state of Florida, and sent to Morris at Mountainburg, Arkansas, with authority to fill in the blanks in the mortgage.

"19. Morris, as cashier of the Bank of Mountainburg, requested Hoover to make a payment on his note and Hoover, on February 11, 1920, authorized a sight draft for $2,500, which was drawn on that day, payable to the Bank of Mountainburg. The draft was paid by Hoover and at that time he had no notice or knowledge that the note and mortgage had been transferred to The First National Bank of Van Buren.

"20. $2,000 of the amount realized from the sight draft was paid to The First National Bank of Van Buren.

"21. In 1920, Hoover allowed Morris to use his list of customers during the berry season, the business being conducted in the name of N. N. Hoover & Company, under an arrangement whereby Hoover was to share in the profits. $1,000 of the profits arising from this transaction was paid by Morris to the Bank of Mountainburg, to be applied on Hoover's note.

"22. That the $1,000 so paid was paid by Morris as the agent of Hoover and Morris at that time had actual knowledge that the Hoover note and mortgage had been previously assigned to The First National Bank of Van Buren, and was not owned by the Bank of Mountainburg.

"24. That all matters between Hoover and Morris, relating to the 'peach deal,' were fully settled on September 18, 1919.

"25. That N. N. Hoover did not consent to the alteration of the mortgage and had no knowledge thereof until some time during the fall of 1920."

National Bank v. Hoover.

The court also made conclusions of law as follows:

"1. The transaction between N. N. Hoover and E. E. Morris relating to the purchase and sale of peaches in 1919, constituted a joint venture rather than a partnership.

"2. The indebtedness represented by the $6,800 overdraft in the Bank of Mountainburg in the 'peach account' was the debt of E. E. Morris and not the joint debt of E. E. Morris and N. N. Hoover.

"3. The payment by N. N. Hoover to the Bank of Mountainburg of $2,500 was a payment on his note for $3,400, and he is entitled to a credit thereon for such amount.

"4. The $1,000 payment made to the Bank of Mountainburg by E. E. Morris, for N. N. Hoover, did not constitute a payment on the $3,400 note of N. N. Hoover.

"5. The alterations of the Hoover mortgage were such as to render it void."

In accordance with these findings and conclusions the court rendered a personal judgment against N. N. Hoover and in favor of plaintiffs for $1,240.78, being the balance due on the $3,400 note executed by Hoover, after crediting his $2,500 payment, and decreed the mortgage to be void because of the material alterations made therein, and ordered it canceled of record. Both parties have appealed to this court and it will avoid confusion to refer to them as plaintiffs and defendants as they appeared in the court below.

The plaintiffs do not question the findings of fact made by the trial court. They complain that the court erred in holding that the transaction between N. N. Hoover and E. E. Morris relating to the purchase and sale of peaches in 1919 constituted a joint venture rather than a partnership, and in holding that the indebtedness of $6,800 represented by the overdraft at the Bank of Mountainburg was the debt of Morris and not the joint debt of Morris and Hoover. Since plaintiffs are claiming to be indorsees of the notes for value before maturity and holders of them in due course, it is difficult to see what standing they have to go back of the notes and say that the notes on their face do not represent the true liability of the parties. They sue on the notes and mortgage, not on the original indebtedness to the Bank of Mountainburg. In other words, plaintiffs take the anomalous position that they, as indorsees and holders in due course of the notes in suit, can go back and show, that because of some business relations between Hoover and Morris, not shown in writing anywhere, Hoover is liable on the $3,400 note signed by Morris and which he did not sign, but that Hoover cannot go back of the face of the papers to show his actual liability thereon, nor to

show payment, nor to show that the mortgage was avoided by material alterations. As obviously inconsistent as this position is, we shall not base our decision entirely upon it, for, as we shall presently see, the notes in suit are not negotiable instruments.

In 15 R. C. L. 500, it is said:

"While it is true that at common law coadventurers in an enterprise were recognized in courts only when the element of partnership was disclosed and on proof of the essential of a partnership, this is not the law at the present time, and, although courts in modern times do not treat a joint venture as identical with a partnership, it is so similar in its nature and in the contractual relationships created thereby that the rights as between the adventurers are governed practically by the same rules that govern partnerships. A joint adventure generally relates to a single transaction. The usual test of a partnership as between the parties to a joint adventure is their intent to become partners." (See, also, notes in 115 Am. St. Rep. 407, and *Fewell v. American Surety Co.,* 80 Miss. 782, and cases there cited.)

In an elaborate note upon Joint Adventures in 17 Ann. Cas., 1025, it is said, following the report of *Berry v. Colborn,* 65 W. Va. 493:

"The rule is well settled that unless it is otherwise stipulated in the contract of joint adventure, the losses sustained in the adventure must be borne equally by the parties thereto. *Tuyes v. Avegno,* 23 La. Ann. 177; *Roehl v. Porteous,* 51 La. Ann. 1746, 26 So. 440; *Hart v. McDonald,* 52 La. Ann. 1686, 28 So. 169; *Chaflin v. Godfrey,* 21 Pick. (Mass.) 1; *Floyd v. Efron,* 66 Tex. 221, 18 S. W. 497. Accordingly it has been held that where a party to a joint adventure acts fairly and in good faith he is not liable for the whole, but only for his share of the losses of the adventure. *Lyles v. Styles,* 2 Wash. 224, 15 Fed. Cas. No. 8, 625; *Runkle v. Burrage,* 202 Mass. 89, 88 N. E. 573."

In 23 Cyc. 462, it is said:

"Liabilities incurred by one party in the due execution of the joint adventure are binding upon all the parties jointly; . . . But if the party creating the liability is authorized to and does deal in his individual name, or if he creates the liability in the performance of obligations imposed upon him individually by the contract, or if the contract is void under the statute of frauds, his associates are not bound therefor." (See, also, *Lafon v. Chinn,* 6 B. Mon. (Ky.) 305; *Cooper v. Frierson,* 48 Miss. 300; *Etzkorn v. Levy,* 159 N. Y. S. 801; *Williams v. Gillies,* 75 N. Y. 197; *Lawrence v. Streeter,* 130 Minn. 64.)

Applying these authorities to this case: this was a single adventure for the sale of peaches during the summer of 1919. Nothing in the findings nor in the record as abstracted indicates any prior business relations between Hoover and Morris, nor that their business relations during that time pertained to any other matter.

Under their agreement as shown by the evidence and found by the court, Morris was to buy the peaches; Hoover had nothing to do with that. Whether Morris used his own money or borrowed it or used the money of the bank of which he was cashier was his business, not Hoover's. To buy the peaches and pay for them was Morris's duty and obligation under his contract with Hoover, and if he borrowed money to use for that purpose it was his debt and not Hoover's. There is no finding nor any intimation in the record that a firm name was used, nor that any partnership relation was proclaimed or held out to the business world generally, or to the bank, or to anyone. This business venture closed at the end of the peach-selling season in September, 1919, and the losses were ascertained to be $6,800. It would seem that there was no question between the parties as to their respective liability. Each owed one-half of the loss. Hoover borrowed $3,400 from the Bank of Mountainburg and paid his half of the loss. (He suggested going to his bank at home to make the loan, but was informed he could get the loan there and did so.) Morris did the same thing. The discount committee of the bank approved the loans. So, both the parties engaged in the business adventure, and the only creditor of either of them were evidently in agreement as to the respective liability of the parties when the matter was settled and closed up. Why should a court say, as a matter of law, that the respective liability of the parties is different from what they and the only creditor understood and agreed it to be? The trial court did not err in holding that the relations between Hoover and Morris were in the nature of a joint adventure, rather than a partnership, and in further holding that the debt represented by the overdraft of $6,800 at the Bank of Mountainburg was the debt of Morris and not the debt of Hoover and Morris.

Plaintiffs further complain of the judgment of the trial court holding the mortgage void because of material alterations therein and ordering it canceled of record. It is argued that the alterations are not material. Perhaps the adding of the name "E. M. Hoover" to the mortgage and in the acknowledgment would not increase or diminish the liability of N. N. Hoover and should be regarded as an immaterial alteration, especially in view of the fact that neither Hoover nor his wife were ever residents of the state of Kansas (Gen. Stat. 1915, § 3831). But the changing of the amount of the in-

debtedness secured by the mortgage from $3,400 to $6,800 and adding a clause thereto by which it purported to secure in addition to Hoover's own note of $3,400 a note signed by E. E. Morris for $3,400 is a material alteration. It has been held that where one party gives a mortgage to secure a note given by another the mortgagor becomes liable for the debt represented by the note. (*Deland v. Mershon,* 7 Iowa, 70.) It is universally held that the alteration of an instrument by changing the amount of money represented or secured thereby is a material alteration. Many cases involving the alteration of written instruments have been before the courts. It will serve no good purpose to undertake an analysis of the many phases of the subject. This is well done in 2 C. J. 1168-1295. In an exhaustive note on the subject, 86 Am. St. Rep. 82, it is said:

"The voluminous body of law and of decided cases relating to the effect of the unauthorized alteration of writings is made up entirely of qualifications of, and exceptions to, one general and well-established rule. Briefly stated it is, that 'any change in a material part of a written instrument, after such instrument has been fully executed by a party to such instrument or one claiming under him, and without the consent of the party sought to be charged, renders such instrument void even in the hands of an innocent holder.'

"With certain qualifications peculiar to each state, the above rule is now firmly established in all of the states." (Citing many authorities, among them *Lemay v. Williams,* 32 Ark. 166; *Johnson v. Moore,* 33 Kan. 90, 5 Pac. 406.)

To determine the effect of the alteration made in the amount of the mortgage made in this case, it is only necessary to determine the circumstances under which and by whom the alterations were made and apply the well-settled principles of law. After Hoover had given his note for $3,400 to the Bank of Mountainburg he went to Florida. About three weeks later the cashier of the bank wrote Hoover that the bank commissioner required security for his note. Hoover made out and acknowledged a mortgage to the Bank of Mountainburg on land he owned in Kansas to secure his note and sent it to Morris, cashier of the bank, describing the note to be secured by it as "one promissory note dated the 18th day of September, 1919, payable ———— after date, with interest at the rate of ———— per cent per annum from date, being made by the party of the first part and payable to the party of the second part." Not having with him a notation of the exact amount of the note, its due date or the rate of interest, blanks were left in the mortgage for

these items and he wrote Morris authorizing him to fill the blanks before filing the mortgage for record. Morris did fill the blanks as directed by Hoover to secure his note and afterwards changed the mortgage so it secured both the Hoover note and the Morris note. (12th finding.) The evidence of Morris, as abstracted by plaintiffs, is more explicit than the finding. "Hoover executed a mortgage on his land in Wichita county, Kansas, to secure his note and sent it to me, leaving the amount blank and wrote me to fill in the amount of his note and I filled in the amount for $3,400. The bank commissioner required the Hoover mortgage to secure the entire $6,800 and I changed the mortgage so as to make it cover both of our notes." So here we have a material alteration made in a mortgage after it had once been filled out in accordance with the instructions of the mortgagor by the cashier of the bank, in whose favor it was drawn, and because the bank commissioner (now one of the plaintiffs in this suit) required the Hoover mortgage to secure the entire $6,800. Such an alteration renders the mortgage void. Plaintiffs argue that the general rule relating to material alterations of written instruments is not controlling for the reason that the notes sued on are negotiable instruments; that the plaintiffs are holders in due course and that under section 124 of the uniform negotiable-instruments act in force both in Arkansas (Crawford & Moses Digest of the Statutes, § 7890) and in Kansas (Gen. Stat. 1915, § 6652), the mortgage should in any event be enforced in accordance with its original tenor. We shall not stop to analyze the effect of the alteration being in the mortgage instead of being in the note. The trouble with the argument is that the notes in suit are not negotiable instruments. The notes contain the following clause: "The makers  .  .  . of this note hereby  .  .  . consent that the time of payment may be extended without notice thereof." This makes the date of payment uncertain within the meaning of section 4 of the uniform negotiable-instruments law (Gen. Stat. 1915, § 6531; Ark. Crawford & Moses Digest of the Statutes, § 7770), and renders the note non-negotiable. *Bank v. Engler*, 112 Kan. 708, 212 Pac. 656.) Hence the decision must rest upon the principles of law relating to the alteration of instruments, rather than upon the terms of the uniform negotiable-instruments law, and the court did not err in holding that the mortgage could not be enforced.

The defendant in his **appea**l, in addition to some of the questions

which have heretofore been discussed, contends that plaintiffs have no standing to maintain this suit in Kansas. When the suit was filed, service was had upon the defendant by publication. The defendant answered without any attempt to make a special appearance, and, among other things, plead the material alterations of the mortgage heretofore discussed and plead payment of the note. The issues being joined, the case was tried. Defendant now contends that he could not be brought into court upon a publication service in a suit upon notes and to foreclose a mortgage and have a personal judgment rendered against him. There is no merit in this contention. Plaintiffs' petition filed asked for a personal judgment and for the foreclosure of the mortgage. Had there been no service or attempted service of any kind, the fact that the defendant filed an answer setting out all his defenses and the case was tried out without any question of the service having been raised, gave the court full jurisdiction to render any judgment proper under the pleadings and evidence.

The judgment of the court below is affirmed.