No. 49,832

MODERN AIR CONDITIONING, INC., *Appellee,* v. CINDERELLA HOMES, INC., *et al., Appellants.*

(596 P.2d 816)

Opinion filed June 9, 1979.

*Keith A. Greiner,* of Keith A. Greiner, Chartered, of Emporia, argued the cause and was on the brief for the appellants.

*Michael G. Patton,* of Patton & Meyer, of Emporia, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

MILLER, J.: This is an appeal by Ames Real Estate, Inc., from a judgment for $35,217.47 entered against it and in favor of Mr. and Mrs. Larry J. Madsen, following a jury trial in Lyon District Court. A statement of the complicated background facts is necessary to an understanding of the various issues presented.

Fred Warbritton and Marion Gum organized a corporation, Cinderella Homes, Inc., in 1974. The purpose of the corporation was to build houses in Emporia. Office space for Cinderella Homes, Inc. was provided virtually free of charge in the offices of Ames Real Estate. During its short existence, Cinderella built six houses in Emporia, and Ames Real Estate had some connection with or interest in each of them.

Larry Madsen and his wife Elizabeth lived on Goura Street in Emporia, in a home which they had purchased through Ames Real Estate. In August, 1974, Madsen went to the Ames office and talked to Bill Ames about building a new home. Ames told Madsen that Ames Real Estate was not building houses anymore, but that Cinderella Homes, in their office, was; Ames introduced Madsen to Gum, and the three of them looked at house plans and discussed costs. Madsen told them that he would need a V.A. loan. The possibility of building on one of three lots, all of which were owned by Ames Real Estate, was discussed. Madsen decided to view the lots.

Madsen looked at the lots several days later, selected one on Trailridge, and returned to the Ames office where he engaged in further discussion with Ames and Gum. Madsen signed an application for a V.A. loan, and told Ames and Gum that the only way he could afford to build a house on Trailridge was to sell the Goura Street property. Bill Ames orally guaranteed Madsen that the Goura Street property would sell for $25,000. Mr. and Mrs. Madsen signed a contract with Cinderella Homes at the Ames office, on October 11, 1974, for the construction of a new home on

the Trailridge lot. The contract price for the land and improvements was $34,350, and Madsens had a commitment for a V.A. loan at 8¼% interest for the purchase price. Ames and Gum told Madsen that he would be in the new home by Christmas.

Ames Real Estate conveyed the Trailridge lot to Cinderella Homes on December 23, 1974. Cinderella gave Ames a note for the purchase price, but no mortgage was executed. Bill Ames helped arrange a construction loan to Cinderella from the Emporia State Bank and Trust, granted on December 24. The basement was dug and construction commenced the last week in December. Ames and Gum told Madsen that the delay in construction was caused by V.A. loan paper work.

Ron Foxx did the concrete work on the Trailridge house. He was contacted by Bill Ames, left his bid with Ames Real Estate, took his statements to Ames Real Estate, and received his checks there. He thought he was working for Ames. His concrete work was inspected by Bill Ames, Paul Henshew (an Ames employee), and Marion Gum. The basement was done in December, 1974, and the walls were poured in late January, 1975.

Gum left Cinderella in late January, 1975, and went to work for Ames Real Estate. Fred Warbritton continued to manage Cinderella Homes, and attempted to complete the Trailridge house. Finally, in April, with Warbritton's consent, the Madsens moved into the yet unfinished home. Meanwhile, Ames Real Estate had been unable to sell the Goura Street property. Madsen asked Bill Ames to honor his $25,000 guarantee; Ames responded that the guarantee was contingent upon closing the Trailridge transaction. Madsens then decided to try to sell the Goura Street property themselves; they were unable to do so.

On August 9, with liens of subcontractors already filed against the new house, Ames, Warbritton, Madsen, and the latter's attorney, Marc Hurt, met at the Ames Real Estate office. Warbritton promised to complete the construction. Ames and Madsen negotiated a settlement on the Goura Street property; Ames Real Estate was to pay and Madsen was to accept $23,700 less Ames' 6% commission.

A few days later Ames rented the Goura Street property to Jim and Sheryl Moddrell. They signed a lease for one year, paid the first month's rent, a $230 cleaning deposit, and $230 for an option to buy the property. Moddrells were interested in buying the

property for $25,000, and so informed Ames. Ames never communicated the offer to the Madsens, and at trial contended that Moddrells had no option, and were not financially able to buy the property. Mrs. Moddrell testified that they had $1200 in cash plus some certificates of deposit; finally, after repeated contacts with Ames, they gave up and bought another house through another agent. Their cleaning deposit and option money was refunded and the balance of their lease was canceled by Ames Real Estate. The Goura Street house was finally sold by another realtor for $23,500 less a 6% commission.

On September 5, Warbritton, in writing, authorized Ames Real Estate to complete the Madsen house on Trailridge, as well as two other houses Cinderella had under construction. A further meeting was held at the Ames office September 19. The Madsens signed a waiver of completion so that the V.A. would release the loan funds. Bill Ames orally agreed to pay off the mechanics' liens, and he agreed in writing to complete seven items of construction. Thereafter, Ames completed some but not all of the construction items, but he did not pay the lienholders. The V.A. loan commitment expired. In November, an Ames employee told Madsens that they were going to have to move out of the house because the contract price was less than the amount of the liens.

One of the subcontractors, Modern Air Conditioning, Inc., filed this lien foreclosure action on April 8, 1976. The Madsens and Ames Real Estate were among the defendants. The Madsens filed a cross-claim, which is the subject of this appeal, against Ames Real Estate. This was tried separately; the lien claims were tried first. Foreclosure of the liens was ordered; at the sale, after all bidders except Madsen and Bill Ames had dropped out, Ames bid the price up about $5,000; Madsen was ultimately the successful bidder and bought the property for $35,101 on March 17, 1977.

Madsens' cross-claim alleged that Ames Real Estate, Cinderella Homes, Gum and Warbritton were joint venturers in the development of the Trailridge property, with Ames supplying the unimproved lot and Cinderella constructing the house; that all parties to the joint venture intended to participate in the profits and all exercised joint control and joint ownership. Madsens claimed that their contract was with the joint venturers, and they sought $15,000 for nonperformance and breach of that contract.

Default judgment was entered against Cinderella Homes and Warbritton; the cross-claim against Gum was apparently not pursued; only the claim against Ames Real Estate was tried, and is of interest here.

By an amended cross-claim, the Madsens also claimed that Ames Real Estate, by its agent, Bill Ames, promised to pay all liens and complete construction of the Trailridge house, and failed to do so; that such promises constituted material misrepresentations and fraud, entitling Madsens both to actual and punitive damages. They also claimed that Ames defaulted on its promise to buy the Goura Street property for $25,000, and that Ames breached its fiduciary duty as a realtor when it failed to sell the Goura Street property to the Moddrells, who offered $25,000 for it. They sought actual damages of $1500 and punitive damages of $4500 for breach of this fiduciary duty. The jury returned a verdict for the Madsens for $17,217.47 actual damages and $18,000 punitive damages, against Ames Real Estate. The jury answered special questions as follows:

"If you find for the [Madsens] because you find [Ames Real Estate] and Cinderella Homes, Inc., were engaged in a joint venture, what factors do you find to indicate a joint venture:

"(1) Shared office. (2) [Ames Real Estate] did not take security (mortgage) on lot at 1349 Trailridge drive. (3) By the close association of Ames & Cinderella Homes a strong impression was given that this was a joint venture because of the mutual acts and conduct of both parties.

"If you find for the [Madsens] because you find [Ames Real Estate] made contracts with [the Madsens] to complete certain items of construction and pay certain liens and bills on the Trailridge property, what do you find to be the consideration for such contracts:

| "1. | Marc Hurt's title opinion | $ | 50.00 |
|---|---|---|---|
| 2. | Closing of sheriff's sale | | 223.00 |
| 3. | Increased interest on V.A. loan at 8½% | | 5,168.47 |
| 4. | Increased interest on conventional loan at 9¼% | | 3,247.50 |
| 5. | Tax lien held by IRS at 8% | | 6,277.50 |
| 6. | Price differential at sheriff's sale | | 751.00 |
| 7. | Price differential on house at 1302 Goura | | 1,500.00 |
| | Total | | 17,217.47" |

The first, and perhaps the most substantial issue, is whether there was sufficient competent evidence to justify the giving of an instruction on joint venture by the trial court, and to support the jury's finding of joint venture. Both parties rely upon *Stricklin v. Parsons Stockyard Co.,* 192 Kan. 360, 388 P.2d 824 (1964). In that opinion we said:

"It is unnecessary to define precisely the term 'joint adventure,' but suffice it to say it is an association of two or more persons to carry out a single business enterprise for profit. (*Whan v. Smith* [130 Kan. 9, 11, 285 Pac. 589 (1930)]; *Curtis v. Hanna,* 143 Kan. 186, 53 P.2d 795.) A joint adventure can exist only by the agreement of the parties. (*Whan v. Smith,* supra.) The agreement may be found in the mutual acts and conduct of the parties. (*National Bank v. Hoover,* 114 Kan. 394, 218 Pac. 1003; *Howard v. Zimmerman* [120 Kan. 77, 79, 242 Pac. 131 (1926)]; *Curtis v. Hanna,* supra; *Grannell v. Wakefield,* 169 Kan. 183, 186, 217 P.2d 1059.) While courts do not treat joint adventure in all respects as identical with a partnership, it is so similar in its nature and in the contractual relations created thereby that the rights and liabilities as between the adventurers are governed practically by the same rules that govern partnerships. (*Whan v. Smith,* supra; *Curtis v. Hanna,* supra; *Flitch v. Boyle,* 147 Kan. 600, 602, 78 P.2d 9.) The usual test of a partnership as between the parties to a joint adventure is their intent to become partners. Joint ownership of property is not essential to create the relationship; it is only a circumstance which should be considered with other circumstances. (*Grantham v. Conner,* 97 Kan. 150, 154 Pac. 246; *Grannell v. Wakefield,* supra.)" (p. 363.)

The issue in *Stricklin* was whether the petition, filed under our earlier rules of civil procedure, adequately alleged a joint venture. We held that the petition in *Stricklin,* disclosing a series of correlated facts and circumstances, some of which meet some one of the tests regarded as a standard for determining the relationship, was sufficient when attacked by a demurrer. We noted that the petition tends to show that by their mutual acts and conduct, the defendants were associated together in a joint adventure with equal privileges to control the method and means, and to prescribe the conditions and use of the property.

In the recent case of *Neighbors Construction Co., Inc. v. Seal-Wells Construction Co., Inc.,* 219 Kan. 382, 548 P.2d 491 (1976), we discussed joint ventures and the agency relationship between members thereof. We said:

"A joint venture is defined in 46 Am. Jur. 2d, Joint Ventures, § 1, pp. 21, 22:

" 'A joint venture is an association of persons with intent, by way of contract, express or implied, to engage in and carry out a single business venture for joint profit, for which purpose they combine their efforts, property, money, skill, and knowledge, without creating a partnership or a corporation, pursuant to an agreement that there shall be a community of interest among them as to the purpose of the undertaking, and that each joint venturer shall stand in the relation of principal, as well as agent, as to each of the other coventurers, with an equal right of control of the means employed to carry out the common purpose of the venture. . . .'

"The agency relationship between members of a joint venture is stated in 46 Am. Jur. 2d, Joint Ventures, § 57, p. 76:

" 'The liability of one engaged in a joint enterprise, for the acts of his associates, is founded on principles of agency. In accordance with the general rule that each member of a joint venture acts as both principal and agent of his coventurers as to those things done within the apparent scope of the venture and for its benefit, it is held that each of several joint venturers has power to bind the others and to subject them to liability to third persons in matters which are strictly within the scope of the joint enterprise. . . .' " (p. 385.)

Also, we noted in *Neighbors* that joint ventures and partnerships are so similar in nature that they are governed by the same rules of law. In *Potts v. Lux,* 161 Kan. 217, 222, 166 P.2d 694 (1946), Justice Parker enumerated various factors which may be considered and which are helpful in determining whether a partnership exists, when the existence of the relationship is controverted. Many of those items are enumerated above.

In sum, the cases indicate that a joint venture is an association of two or more persons or corporations to carry out a single business enterprise for profit; it may be found in the mutual acts and conduct of the parties. Among the acts or conduct which is indicative of a joint venture, but no single one of which is controlling in the determination, are: (1) the joint ownership and control of property; (2) the sharing of expenses, profits and losses, and having and exercising some voice in determining the division of the net earnings; (3) a community of control over and active participation in the management and direction of the business enterprise; (4) the intention of the parties, express or implied; and (5) the fixing of salaries by joint agreement. The following acts or conduct have also been mentioned as being helpful, but one authority does not consider them so: (a) investment in the business of undistributed profits for the purpose of building up a substantial cash reserve; (b) the charging of losses against accumulated profits; and (c) division of undistributed profits in the event of liquidation contingent upon repayment to one of the parties of cash originally invested in capital.

Ames Real Estate contends that there was no evidence of any intention by Cinderella or Ames to enter into a joint venture; there was no evidence of an agreement to enter into a joint venture; no profits or losses were shared; and there was no evidence that Ames shared in the management and direction of the business. The Madsens, on the other hand, point to a number of facts which support the finding of joint venture: Cinderella

and Ames Real Estate shared office space, secretarial help and telephone lines; Ames was to receive a fee for all building referrals to Cinderella; Bill Ames introduced Madsen to Gum and participated fully in the negotiations; Ames Real Estate owned the Trailridge lot, transferred title to Cinderella and took back a promissory note but no mortgage as security; Ames Real Estate was to receive a profit of $4,500 on the building of the Madsen house and sale of the Trailridge lot; this amounted to approximately 12½% of the gross sales price; Cinderella gave written authorization to Ames to complete the Madsen house, as well as two others; Ames Real Estate had financial ties with all houses built by Cinderella; Ames agreed to complete the construction and to pay the mechanics' liens, and gave repeated assurances to the Madsens that Ames would do so; Ames' employees inspected the structure during construction; Ames' employees contacted and arranged for the employment of subcontractors, handled the paper work, and sent bills for labor and materials to the bank for payment.

When the sufficiency of the evidence is attacked upon appeal, our scope of review is well established. It is not the province of this court to weigh evidence or pass on the credibility of the witnesses; a verdict cannot be disturbed on appeal if there is substantial evidence in the record to support it. *Kleibrink v. Missouri-Kansas-Texas Railroad Co.,* 224 Kan. 437, 581 P.2d 372 (1978). Where the existence of a joint venture is controverted, the relationship may be found in the mutual acts and conduct of the parties. We have carefully considered the evidence in this case, and conclude that there was sufficient competent evidence to justify the giving of the joint venture instruction by the trial court, and to support the verdict of the jury, finding a joint venture.

Next, appellant contends that there was not sufficient evidence of consideration to support its promise to complete construction and pay off the lienholders. As we noted above in the quotation from *Neighbors,* each member of a joint venture acts as the agent of his coventurers; thus Ames, having been found to be a coventurer, was already bound to complete construction and pay the liens. The finding on the joint venture issue disposes of this consideration argument.

Appellant contends that there was no evidence to support the trial court's instruction on punitive damages, based on fraud and

misrepresentation. Appellees agree that in order to entitle them to punitive damages, there must be some evidence of conduct by the opposing party that can be characterized as malicious, vindictive, oppressive, fraudulent, or a willful and wanton disregard of the other's rights. The only charge before the court and jury here was that the promises of Ames Real Estate to pay the liens and complete construction constituted material misrepresentations and fraud. There was no specific allegation of willfulness, wantonness, or of malicious, vindictive, or oppressive conduct. An unjustified breach of contract does not entitle an opposing party to punitive damages; as a general rule, damages for breach of contract are limited to pecuniary loss sustained. *Hess v. Jarboe,* 201 Kan. 705, 443 P.2d 294 (1968). The mere statement by Ames that he would pay the liens and complete the construction was not a false representation of an existing and material fact, unless at the time the statement was made Ames had no intention of performing those promises. When alleged fraud relates to promises or statements concerning future events, the gravamen of such a claim is not the breach of the agreement to perform, but the fraudulent representation concerning a present, existing intention to perform, when such intention is in fact nonexistent. *Edwards v. Phillips Petroleum Co.,* 187 Kan. 656, 360 P.2d 23 (1961); and see PIK Civ. 2d 14.41 (1977). Thus Ames' promise to perform, and his failure to do so, do not entitle Madsens to punitive damages, unless the evidence discloses that Ames did not intend to perform upon those promises at the time they were made; that the promise was made with intent to deceive Madsens and to induce them from refraining to act; that Madsens reasonably relied upon the promises; and that they sustained damages thereby. The burden of proving fraud is by a preponderance of the evidence, but that evidence must be clear, convincing, and satisfactory. *Fox v. Wilson,* 211 Kan. 563, 579, 507 P.2d 252 (1973). "Clear and convincing evidence" means that the witnesses to a fact must be found to be credible; the facts to which the witnesses testify must be distinctly remembered; the details in connection with the transaction must be narrated exactly and in order; the testimony must be clear, direct and weighty; and the witnesses must be lacking in confusion as to the facts at issue. *Gonzalez v. Allstate Ins. Co.,* 217 Kan. 262, 535 P.2d 919 (1975), quoting from *In re Estate of Shirk,* 194 Kan. 424, Syl. ¶ 2, 399 P.2d 850 (1965).

Upon a careful review of the evidence before us, we conclude that there was no independent tort which would be necessary to support an award of punitive damages in a breach of contract action, and there was no intentional fraud established by clear and convincing evidence. We find nothing to indicate that, at the time the promises were made, Ames did not intend to complete the few items of construction remaining, pay the lienholders, and close the transaction. Thereafter, when it became apparent that the liens exceeded the amount of money available for distribution, the promises were not carried out. This was simply a breach of contract.

We have not overlooked Madsens' contention that Ames breached its fiduciary duty as a realtor in failing to disclose the Moddrell offer, and that breach of a fiduciary duty may in some circumstances give rise to a claim for punitive damages. *Ford v. Guarantee Abstract & Title Co.,* 220 Kan. 244, 553 P.2d 254 (1976). In the case at hand, however, Bill Ames explained that he did not know and was not advised that the Moddrells had some certificates of deposit which they could have cashed and used in effecting the purchase. There is nothing in the record to show that those certificates were disclosed to Ames by Mr. and Mrs. Moddrell. Accordingly, Ames might well have concluded that the Moddrells were not financially able to conclude the transaction; at any rate, the evidence is not sufficiently clear and convincing to establish such a gross neglect of duty as would justify the imposition of punitive damages. The judgment for punitive damages must therefore fall.

Appellants complain that the answer of the jury to the second special question was not an answer to the question but was, in effect, a listing of the actual damages which the jury found; and appellants contend that the answer constitutes sufficient grounds for the granting of a new trial. By that question, the court asked the jury to designate the consideration for the agreement of Ames Real Estate to complete construction and pay the liens. Since the jury determined that Ames was a joint venturer, the issue of consideration was no longer of importance in the case, and the jury's error in responding to the second special question is immaterial.

Next, appellants challenge the propriety of certain of the ele-

ments of actual damage enumerated by the jury in response to the second question. They first contend that the award of $223 for loan closing charges was improperly permitted to stand, since under the contract the Madsens were required to pay loan closing costs. The simple answer to this is that the $223 represented short term loan closing costs, caused by the breach of the initial contract. They challenge the increased interest charges, totaling $8,415.97 which the jury enumerated in two items, $5,168.47 and $3,247.50. While the method followed by the jury in arriving at these precise figures is not clear from the evidence, there was testimony by a certified public accountant that over the life of a conventional loan, the Madsens would be required to pay $11,662.15 in additional interest and other costs over and above that which they could have expected to pay under the initial contract and V.A. loan commitment. Included in Mr. Pool's computation was the item of $869 which the Madsens could have taken on their 1975 federal income tax return, had the sale been closed prior to the end of that calendar year. The housing credit law expired, and credits could not be taken for that purpose on 1976 and future federal income tax returns. The delay in closing the sale, which the jury found was attributable to Ames' breach of the contract, caused the loss of that credit. We conclude that evidence of the loss of the housing credit was properly admitted into evidence and that there was substantial competent evidence to support the jury's award of increased interest cost.

Appellants contend that the court should not have permitted evidence of the amount of the federal tax lien, $6,277.50, which amount was awarded to the Madsens as actual damages by the jury in its computation. The United States government was made a defendant in the initial lien foreclosure action; its lien, in the amount stated above, was foreclosed, along with the other liens. Counsel acknowledged on oral argument that the right of the government to redeem had since expired; and there is no showing in the record that the Madsens had to pay the amount of the federal tax lien over and above the sale price. Presumably the government received a percentage of its claim, along with the other lienholders, at the time funds were disbursed, following sale; and the government determined not to exercise its redemption rights. Under the circumstances we conclude that the amount of the government's tax lien, like the liens of those who supply

labor and material to the premises, is not a special item of damage and should not have been awarded to the Madsens as an item of actual damage. The award must therefore be reduced by that amount.

We have carefully considered each of the other points raised, and find no error.

The case is remanded to the district court with directions to set aside the judgment for punitive damages, and to reduce the judgment for actual damages from $17,217.47 to $10,939.97. As so modified, the judgment is affirmed.