**NATURE'S SHARE, INC. d/b/a Heaven's Harvest, Plaintiff,**

v.

**KUTTER PRODUCTS, INC., Defendant and Third Party Plaintiff.**

**S & R SEED CO., INC., formerly Tobin Lawn and Garden Supply Co., Inc., Defendant,**

v.

**LOVE BOX COMPANY, Third Party Defendant.**

No. 88 1035 C.

United States District Court, D. Kansas.

Oct. 4, 1990.

374

John H. Gibson, Carl L. Wagner, Boyer, Donaldson & Stewart, Wichita, Kan., for plaintiff.

John J. Jurcyk, Jr., Daniel F. Church, McAnany, Van Cleave & Phillips, Kansas City, Kan., for Kutter Products.

Frederick K. Starrett, Miller and Bash, Overland Park, Kan., and Roy Bash, Kansas City, Mo., Debra J. Arnett, McDonald, Tinker, Skaer, Quinn & Herrington, Wichita, Kan., for S & R Seed Co., Inc.

Robert D. Overman, Ross A. Hollander, Martin, Churchill, Overman, Hill & Cole, Wichita, Kan., for Love Box Co.

## MEMORANDUM AND ORDER

CROW, District Judge.

The case comes before the court on several dispositive motions: Kutter Products, Inc.'s motion for summary judgment; S & R Seed Company, Inc.'s motion for summary judgment; Nature's Share, Inc.'s motion for partial summary judgment; Love Box Company's motion to dismiss or in the alternative for partial summary judgment; and Nature's Share, Inc.'s motion to amend the pretrial order. Plaintiff, Nature's Share, Inc. (Nature's Share), alleges the defendant, Kutter Products, Inc. (Kutter), breached a contract and an implied warranty of merchantability and was negligent in developing and assembling corrugated disposable bird feeders with infested bird seed. Kutter counterclaims against plaintiff for negligence in not instructing on the proper maintenance of the bird seed, fraudulent concealment of the fact the seed was infested, and breach of its third-party contractual duties. Nature's Share brings a negligence claim against defendant, S & R Seed Co., Inc. (S & R), for supplying infested bird seed. Kutter has also filed a third-party complaint against Love Box Company (Love Box) for breach of contract and negligence.

In ruling on a motion for summary judgment, the trial court conducts a threshold inquiry of the need for a trial. Without weighing the evidence or determining credibility, the court grants summary judgment when no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–252, 106 S.Ct. at 2512.

■■■ An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. at 2510. An issue of fact is "material" if proof thereof might affect the outcome of the lawsuit as assessed from the controlling substantive law. 477 U.S. at 249, 106 S.Ct. at 2510. Factual inferences are drawn to favor the existence of triable issues, and where reasonable minds could ultimately reach different conclusions, summary judgment is inappropriate. *See Riley v. Brown & Root, Inc.,* 896 F.2d 474, 476–77 (10th Cir.1990).

■■ The movant's initial burden under Fed.R.Civ.P. 56 is to show the absence of evidence to support the nonmoving party's case. *Windon Third Oil and Gas v. Federal Deposit Ins.,* 805 F.2d 342, 345 (10th Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987). The movant must specify those portions of " 'the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits if any,' " which demonstrate the absence of a genuine issue of fact. *Windon,* 805 F.2d at 345 (quoting Fed.R.Civ.P. 56(c)). It may be sufficient for the movant to establish that the alleged factual issues are without legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.,* 812 F.2d 1319, 1323 (10th Cir.1987).

■■■ The opposing party may not rest upon mere allegations or denials in the pleadings but must set forth specific facts supported by the kinds of evidentiary materials listed in Rule 56(c). *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. The nonmoving party's evidence is deemed true and all reasonable inferences are drawn in his favor. *Windon,* 805 F.2d at 346. More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'. Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

For purposes of the motions for summary judgment filed by defendants Kutter and S & R, the following facts are uncontroverted:

1. Nature's Share is in the business of developing, producing and marketing a disposable corrugated bird feeder. Its principals were Paul Porvaznik, Tonk Mills and William Palmer.

2. Kutter is a secondary packaging operation which overwraps and packages finished products, including foodstuffs, into purchase displays and shipping cartons. Love Box is a manufacturer of corrugated boxes and corrugated products. S & R supplies lawn and garden materials such as fertilizers, grass seed and bird seed to people in the lawn business as well as retailers.

3. In April 1986, Paul Porvaznik met with R.D. Love, president and chief executive officer of Love Box, to introduce a disposable bird feeder project which he intended to develop and market. R.D. Love said Love Box would do the necessary research and development for the corrugated bird feeder, and he directed Noel Mertz, design manager and technical services manager for Love Box, to develop the bird feeder. Because Nature's Share was not known as financially secure and lacked any history of doing business and because suppliers would not quote it prices, Love Box in the same month agreed to assist it in locating sources for the component parts: perch rod, string, and bagged bird seed.

4. In May of 1986, Noel Mertz of Love Box inquired of Kutter whether it would be interested in a project to collate, shrink wrap, and store a bird feeder. Kutter also agreed to assist locating sources for the hanging string, dowel rod and one pound bag of bird seed and to obtain price quota-

tions from potential suppliers. Two months earlier, Love Box had entered into an agreement with Kutter to collate and shrink wrap some of Love Box's retail corrugated products.

5. Noel Mertz of Love Box provided Kutter with the specifications for the dowel rod, hanging string, one pound polyethylene bag of bird seed and formula for the bird seed. Nature's Share had decided on the particular seed mixture and the type of bag.

6. Representatives of Love Box did not at any time during the project provide oral or written specifications to Kutter that the bird seed was to be fumigated. (This is not controverted by the testimony of Paul Provaznik of Nature's Share that at some point he spoke with Guy Zabor of Kutter about whether the bird seed was fumigated). At no time during the bird feeder project were any chemicals specified by plaintiff or Love Box for use in fumigating the bird seed.

7. On July 17, 1986, Love Box orally directed Kutter to purchase 100,000 one-pound polyethylene bags of bird seed from S & R, plus 100,000 dowel rods and 100,000 hanging cords for the bird feeders pursuant to specifications provided by Love Box. (This statement is not effectively controverted by the testimony from plaintiff's representatives that they decided to order from Kutter).

8. No party provided S & R with written or oral specifications for fumigation of the birdseed. The principals of Nature's Share had no contact with Tom Tobin or any representative of S & R.

9. On July 28, 1986, Love Box issued a written purchase order, confirming the July 17, 1986, oral directions, for the purchase of the materials. Love Box also requested that Kutter collate, assemble, shrink wrap and ship the bird feeders. (This statement is true whether or not Love Box was acting upon Nature's Share request).

10. Nature's Share never entered into any written contract with Kutter on the disposable bird seed project, including the purchase of materials or the other undertakings.

11. On July 23, 1986, representatives of Love Box, Kutter, Nature's Share and MCI Sales and Marketing met to discuss the sale, distribution, storage and assembly of the bird feeder and other Love Box products. On August 11, 1986, Love Box executed a written contract with MCI for it to sell Love Box's retail corrugated product line and the corrugated bird feeder.

12. In August or September of 1986, Love Box inquired from Kutter whether the bird seed supplied by S & R contained live insects. Within these same two months, S & R informed Kutter, which in turn informed Love Box, that the seed did not include live insects, but insect eggs, which would hatch within six to nine months. Love Box informed Nature's Share in November or December of 1986 that the bird seed could become infested within six to nine months. (Plaintiff has controverted the testimony that it was told the infestation *would* occur within that period). Nature's Share took no action in response to being informed of the possible infestation in six to nine months.

13. After all parties to the project were made aware of this possible infestation, Love Box directed Kutter to continue purchasing the bird seed from S & R. (This fact is not controverted by whether or not Love Box acted on Nature's Share's direction).

14. In the summer of 1986, Noel Mertz of Love Box told Guy Zabor, co-owner of Kutter, to treat Paul Porvaznik of Nature's Share with every courtesy but not to follow Mr. Porvaznik's instructions or directions nor respond to any requests without first contacting Mr. Mertz.

15. Less than 3,000 disposable corrugated bird feeders have been sold.

16. On or about January 26, 1987, Love Box cancelled the contract with MCI to market the bird feeders. Paul Porvaznik agreed with this decision and in February assumed responsibility for marketing the bird feeders. Mr. Porvaznik was to earn a commission on all sales, but he did not sell any bird feeders.

17. On May 21, 1987, Love Box took an inventory of the assembled and unassembled bird feeders at Kutter and discovered 64,609 assembled units. Love Box submitted a final accounting on the bird feeder project to Nature's Share on May 28, 1987.

18. On or about July 16, 1987, Nature's Share was informed that there were live insects in the bird feeders. On or about July 23, 1987, Nature's Share informed Kutter that the bird feeders contained live insects and that there were problems with glue overflow on the shelf carton.

19. On July 28, 1987, Kutter shipped the infested bird feeders to an outside warehouse pending instructions concerning the disposition of the inventory. On July 29, 1987, and thereafter, Nature's Share refused to take possession of the assembled bird feeders. Love Box also refused to take possession of the infested bird feeders. At no time did Nature's Share or Love Box instruct Kutter as to the disposition of the infested bird feeders.

20. On September 16, 1987, Kutter informed Nature's Share that S & R would take the infested bird feeders and pay six (6) cents per pound if Nature's Share disassembled the bird feeders and or pay one (1) cent per pound if Tobin disassembled the bird feeders. Nature's Share refused S & R's offer. (What other measures, if any, that Nature's Share considered or acted upon in salvaging the bird feeders is a controverted fact).

21. In September 1987, the infested bird feeders were transported to S & R where they were disassembled and the bird seed was reprocessed and sold.

22. On September 9, 1987, Love Box retrieved the unassembled bird feeders from Kutter's warehouse and transported them to Love Box's warehouse where they are currently stored.

23. Nature's Share has not attempted to recover from Love Box or even contacted it about the remaining inventory of unassembled bird feeders.

24. Neither Nature's Share nor Love Box provided Kutter with specifications for a quality control program on storage, shelf rotation, and inspection of the bird feeders located at the Kutter warehouse at any time during the bird feeder project.

25. Nature's Share paid $26,252.26 to Kutter after Love Box refused to pay the invoices submitted by Kutter.

26. Nature's Share continues its corporate existence to the present date and the bird feeder is still a marketable product.

## DEFENDANT KUTTER'S MOTION FOR SUMMARY JUDGMENT

In the pretrial order, Nature's Share contends Kutter contracted with it to collate, store and ship bird feeders for which Kutter would be compensated by Nature's Share. Plaintiff claims Kutter breached the contract and the implied warranty of good and marketable condition in that there was excess glue on the bird feeder shelf containers and the bird seed was infested with insects upon shipment. In regards to the infestation, plaintiff alleges specific acts of negligence or breaches of contract by Kutter:

(1) failure to inspect bird seed upon receipt; (2) failure to treat an infestation; (3) failure to fumigate as promised; (4) failure to properly inspect and monitor bird seed while in storage; (5) allowing torn bags of seed to be left open in bins; (6) using bags with holes poked in them; (7) failure to follow up on reports of "flying insects"; (8) failure to notify plaintiff of reports of "flying insects"; and (9) violations of various regulatory acts.

(Dk. 116, p. 10). Kutter seeks summary judgment arguing: (1) insufficient evidence to show a contract; (2) lack of contractual privity for an implied warranty; (3) no legal duty for purposes of a negligence claim; (4) insufficient proof of causation; (5) insufficient evidence for a negligence *per se* claim; (6) improper *res ipsa loquitur* claim; (7) inadequate proof of damages and failure to mitigate; and (8) unrecoverable economic losses. In an effort to prevent summary judgment, the plaintiff identifies several factual issues.

Though conceding no written contract existed between it and Kutter, plain-

tiff insists there is evidence to show an implied contract. The existence or not of a contract is generally a question of fact. *Steele v. Harrison*, 220 Kan. 422, 429, 552 P.2d 957 (1976). "Contracts implied in fact are inferred from the facts and circumstances of the case and are not formally or explicitly stated in words." *Atchison County Farmers Union Co-op Ass'n v. Turnbull*, 241 Kan. 357, 363, 736 P.2d 917 (1987). A mutual intent to contract must be shown for an implied contract in fact to exist. *Id.* at 364, 736 P.2d 917. The terms and conditions of such an agreement may be implied from the parties' conduct. *Id.* at 363–64, 736 P.2d 917.

■ Whether a contract implied in fact existed between Kutter and Nature's Share is a question of material fact. Principals of plaintiff testify to such an agreement while Kutter's representatives deny any such arrangement. Several times during the bird feeder project, Nature's Share dealt directly with Kutter. Plaintiff paid certain bills sent by Kutter. Plaintiff corresponded with Kutter as to completion of the bird feeders in February of 1987. Kutter later wrote plaintiff in July of 1987 referring to the completed bird feeders as plaintiff's inventory. These facts are sufficient to sustain a reasonable inference of a contractual arrangement between Nature's Share and Kutter at some point in time. If and when the implied contract existed and what were its terms are questions reserved for the finder of fact. For this reason, Kutter's summary judgment motion on the implied warranty claim for lack of privity must also be denied.

■ Kutter next contends it is neither a "seller" nor a "merchant" as used in K.S.A. 84-2-314(1), the statutory source for implied warranties of merchantability, which provides in pertinent part:

Unless excluded or modified (section 84–2–316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.

A "seller" is "a person who sells or contracts to sell goods." K.S.A. 84-2-103(1)(d). "Merchant" is defined at K.S.A. 84-2-104(1), as follows:

"Merchant" means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

"Sale" is defined at K.S.A. 84-2-106(1) as the "passing of title from the seller to the buyer for a price...." In this transaction, Kutter considers itself neither a seller nor a merchant.

Kutter states it sold nothing to plaintiff but was directed by Love Box to purchase various component parts including the bird seed. To cover the cost of the parts and its cost in collating, packing, storing and distributing the bird feeders, Kutter used a Love Box purchase order. Kutter says it, at most, bought the components and assembled them only upon the direction of plaintiff or Love Box. Plaintiff's theory is that Kutter sold the assembled bird feeders to it. From the evidence of record, the court cannot find as a matter of law that Kutter never acquired title to the components nor passed that title in billing for those specific charges and/or delivering the finished bird feeders. The letter of July 28, 1986, from Love Box to Kutter, suggests payment to Kutter was for an assembled bird feeder and the cost of components was simply calculated into that payment. The court also cannot find as a matter of law that Kutter acted solely as an agent of plaintiff and/or Love Box when it purchased the component parts and later secured ownership of those parts on behalf of them. Moreover, courts generally recognize that an assembler of component parts who in turn sells the completed product is a seller who may be liable for a breach of the implied warranty. *Signal Oil & Gas Co. v. Universal Oil Products*, 572 S.W.2d 320 (Tex.1978) (24 UCC Rep. Serv. 555).

Hoping to evade a "merchant" status in this transaction, Kutter argues the bird feeder project was an isolated sale of goods. Kutter denies having any prior experience in packaging bird seed. In response, plaintiff offers evidence that a principal with Kutter represented the company could not only package the bird feeders but could "source" the project and obtain the seed from a good friend in the business who "knows everything about seed." A jury could reasonably find upon this representation that Kutter was holding itself out as having knowledge or skill in obtaining components, including bird seed, for later assembly because of its connection with a knowledgeable intermediary. Defendant is unable to show this reasonable inference is insufficient to confer it with a "merchant" status. The court denies summary judgment on plaintiff's implied warranty claim.

Kutter's arguments (3), (4), (5) and (6), as set forth above, need not be addressed, because the plaintiff is seeking only economic losses unrecoverable in tort. The court's analysis and rationale on this point is found under its discussion of S & R's motion for summary judgment. For the same reasons stated later, the court grants summary judgment on plaintiff's tort claims against Kutter.

■■■■ The next contention is that the plaintiff is unable to prove the damages were caused by Kutter's alleged breach of contract. This argument turns upon Kutter's allegation that plaintiff fully understood the bird seed would become infested in six to nine months and did nothing to avert it. To be recoverable, damages must be shown with reasonable certainty to have been the proximate result of the breach of the contract. *Kansas State Bank v. Overseas Motosport, Inc.,* 222 Kan. 26, 27, 563 P.2d 414 (1977). The party injured by a breach has the duty to exercise reasonable care to avoid loss or to mitigate the damages. *Lindsley v. Forum Restaurants, Inc.,* 3 Kan.App.2d 489, Syl. ¶ 4, 596 P.2d 1250, *rev. denied,* 226 Kan. 792 (1979). The duty to mitigate is bounded by common sense and reasonableness. *Id.* at 489, Syl. ¶ 5, 596 P.2d 1250. In this case, it is a

question of fact what a reasonable person would have done, if anything, to avoid infestation upon being told in November or December of 1986 that the bird seed *could* become infested within six to nine months. The certainty of plaintiff's knowledge and the reasonableness of its actions cannot be settled on summary judgment.

Kutter next makes a rambling attack on what damages are recoverable by plaintiff on its breach of contract action. Under damages for cost of production, plaintiff includes such expenses associated with incorporating the business, advertising, rent for an office, legal fees and loans to shareholders. Plaintiff believes the expenses are recoverable since they were "made in anticipation of, or in preparation for, the performance of a contract...." *See Cain Shoes, Inc. v. Gunn,* 194 Kan. 381, 384, 399 P.2d 831 (1965). Kutter aptly questions whether these expenses were incurred in preparation and performance of the contract or in organizing and establishing plaintiff as a business entity.

■■■■ The principals of Nature's Share are not separate plaintiffs in this case. Whatever reasonable expenses that Nature's Share may have incurred in preparation for its performance of the contract with Kutter are recoverable, but the principals' expenses in forming and establishing Nature's Share, whether passed on to Nature's Share or not, cannot be lumped into a cost of production. Because neither party has provided the court with a summary of those expenses, it is unable to identify exactly those expenses and their totals which are not recoverable. Consequently, the court must be content with articulating the general ruling and later applying it at trial.

■■■■ On the loss of inventory damages, Kutter again insists the plaintiff failed to mitigate its damages. As stated in paragraph twenty of the court's uncontroverted facts, it is controverted what measures, if any, Nature's Share considered or acted upon in salvaging the inventory of bird feeders. Summary judgment is inappropriate on this matter.

Kutter also maintains plaintiff's damages on its implied warranty claim are flawed. Kutter first argues the plaintiff, as the manufacturer and producer of the bird feeders, had the duty to design a reasonably safe product, and it cannot recover those damages flowing from its faulty design of the bird feeder. The deposition excerpts found in the body of Kutter's memorandum do not establish the faulty gluing was due to poor design and not the poor work of Kutter. Kutter also asserts plaintiff can only recover the difference between the actual value of the goods at the time of delivery and what their value should have been if they had conformed to the warranty. This assertion ignores the Uniform Commercial Code (UCC) section governing buyer's damages for breach of warranty, K.S.A. 84–2–714(2) and (3). Subsection three states: "[i]n a proper case any incidental and consequential damages under the next section [K.S.A. 84–2–715] may also be recovered." Consequential damages recoverable under the UCC are not very different from the common law rule. *Hochman v. American Family Ins. Co.*, 9 Kan.App.2d 151, 153–54, 673 P.2d 1200 (1984). Kutter has not shown that the plaintiff's alleged damages are not factually or legally recoverable as consequential damages. Kutter's motion for summary judgment is granted in part and denied in all other respects.

## DEFENDANT S & R'S MOTION FOR SUMMARY JUDGMENT

Plaintiff's sole theory of recovery against S & R is negligence. As set forth in the pretrial order, plaintiff alleges S & R was negligent as the supplier of the bird seed in the following respects:

(1) failing to inspect the bird seed upon purchase and to treat any infestation; (2) failing to fumigate and clean bins before storage; (3) failing to inspect and properly monitor bird seed while in storage; (4) failing to inspect bird seed before shipment; (5) failing to treat any infestation of bird seed before shipment; (6) providing Kutter with erroneous information regarding fumigation and storage of bird seed; (7) providing Kutter with bird seed knowing it contained live eggs; and (8) using bags containing holes to hold the bird seed.

On its claims against both defendants, plaintiff currently seeks damages from the performance of its contract—$26,252.26; loss of inventory—$92,775; and costs of production—$180,195.42. Since the filing of the pretrial order, Plaintiff has withdrawn its claim for loss of profits in the amount of $3,695,000. Plaintiff has recently filed a motion to amend the pretrial order to increase its claimed damages for costs of production to $205,477.95. The court will address this motion later.

S & R moves for summary judgment on two grounds. Plaintiff's requested damages are in the nature of economic losses which are not recoverable on a negligence claim. Alternatively, plaintiff is unable to show S & R owed any legal duty to it. Nature's Share concedes on the first ground that it can only recover the loss of inventory since its other damages are in the nature of economic losses. Otherwise, plaintiff opposes the motion on both grounds.

The Tenth Circuit has held that under Kansas law a plaintiff cannot successfully bring a tort action for pure economic losses caused by a qualitative defect in a product. *Daitom, Inc. v. Pennwalt Corp.*, 741 F.2d 1569, 1581 (10th Cir.1984). Before *Daitom*, Kansas courts had stated in general terms that breach of contract principles govern actions where there is simple economic loss. *Haysville U.S.D. No. 261 v. GAF Corp.*, 233 Kan. 635, 643–44, 666 P.2d 192 (1983); *Broce–O'Dell Concrete Products, Inc. v. Mel Jarvis Constr. Co.*, 6 Kan.App.2d 757, 760, 634 P.2d 1142 (1981). The definition of economic loss adopted by the Kansas Supreme Court includes the loss of bargain damages, cost of replacement or repair, loss of profits, loss of good will, and loss of business reputation. *Professional Lens Plan, Inc. v. Polaris Leasing Corp.*, 234 Kan. 742, 751–53, 675 P.2d 887 (1984). The scope of the general rule is delineated and explained by the Tenth Circuit in the *Daitom* decision.

Daitom purchased rotary vacuum dryers from Pennwalt for use in a chemical production process. Daitom alleged serious problems with the dryers as a result of insufficient drying capacity and of misaligned agitator blades which damaged the interior of the dryers and unevenly distributed the dried product. One of Daitom's counts was negligent design and manufacture. The trial court granted summary judgment holding that a tort action did not exist for a purely economic loss. The Tenth Circuit affirmed and began its analysis with the seminal decision of *Seely v. White Motor Co.*, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965). The court construed *Seely* as holding that economic loss was not recoverable in tort if caused by qualitative defects, that is, a defect which "precludes the product from being fit for its intended use or functioning as expected for the purpose it was designed." 741 F.2d at 1581 (citing *Seely*, 45 Cal.Rptr. at 23, 403 P.2d at 151; *Pennsylvania Glass Sand Corporation v. Caterpillar Tractor Company*, 652 F.2d 1165, 1173 (3rd Cir.1981)). The Tenth Circuit in *Daitom* considered the *Seely* decision to have been followed in Kansas.

The Tenth Circuit expounded on the rule announced in *Seely*. The court first advocated doing away with the talismanic terms of "physical damages" and "economic damages." 741 F.2d at 1582. In their place, the court proposed the broad policy test enunciated in *Pennsylvania Glass Sand*, 652 F.2d at 1173, which reads:

> [T]he line between tort and contract must be drawn by analyzing interrelated factors such as the nature of the defect, the type of risk, and the manner in which the injury arose. These factors bear directly on whether the safety-insurance policy of tort law or the expectation-bargain protection policy of warranty law is most applicable to a particular claim.

741 F.2d at 1582. A tort action is available when the nature of the defect, the type of risk and manner of injury are the result of the unreasonable dangerousness of the product. *Id.* Finding that the dryers posed no unreasonable danger to person or property and that the action ensued from the dryers having defects which made them unsuitable for their intended purpose, the Tenth Circuit agreed with the district court that Daitom's requested damages were not recoverable in tort. *Id.*

Plaintiff believes these principles, when applied to the present case, permit its negligence claim. In its brief, the plaintiff explains it seeks as damages for loss of inventory the "damage to the defective product itself (bird seed) as well as for physical damage to property which it destroyed (bird feeders)...." (Dk. 126, p. 15). Plaintiff insists its negligence theory does not take issue with the quality of the bird seed but with the fact the bird seed was infested with live insect eggs which created a hazardous situation which eventually destroyed its property. This argument is more semantics than substance.

Insect eggs in bird seed is rationally analogous to a misaligned agitator blade in a dryer. Both are qualitative defects that preclude the product from being fit for its intended use or functioning as expected for the purpose it was designed. The insect eggs were an ingredient in the bird seed mixture only because the mixture was not fumigated or, in other words, was not of the quality apparently expected by the plaintiff. The bird seed mixture was intended and designed for use in corrugated disposable bird feeders that would be sold in the retail market. When the eggs hatched, the insects damaged the bird seed and the feeders. This prevented the units from being sold or used for their intended purpose.

The nature of the risk here, the infestation of insects, does not implicate tort law. The presence of insects did not pose an "unreasonable danger to persons or property." *See Daitom, Inc.*, 741 F.2d at 1582. Insects in bird feeders is hardly a risk commensurate in any degree with the risk of accident created by a defective chassis frame on a concrete truck, *Fordyce Concrete, Inc. v. Mack Trucks, Inc.*, 535 F.Supp. 118, 119 (D.Kan.1982), or the risk of collapse of a defective 1,400 foot television tower, *Insurance Company of North America v. Townsend Associates,*

*Inc.,* No. 86–2081–S (D.Kan. Feb. 17, 1988). The manner of injury in this case—the hatching of insect eggs after plaintiff had been informed of this possibility and after the bird feeders had been assembled and stored in the warehouse or transported to stores—is not the type of sudden and hazardous injury associated with tort actions.

Plaintiff was in a position to protect itself from this defect in the bird seed by insisting that a warranty be given. This is not a situation which impels a court to have the manufacturer assume the risk of this defect and internalize this cost in the product's price. The fact plaintiff seeks to recover the property damage to the seed and feeders caused by the insects is not a decisive factor in the *Daitom* calculus. The Tenth Circuit affirmed the district court in *Daitom* after mentioning that the plaintiff also sought to recover the physical damages to the concrete pad on which the dryers were mounted and to the pipe and equipment connected to the dryers. Following *Daitom,* the court grants summary judgment for S & R.

Before going to the next motion, the court must briefly note a development in the law in this area. After the *Daitom* decision, the United States Supreme Court, sitting in admiralty, addressed the issue of what constitutes economic loss and unanimously held that an injury to the product itself is an economic loss not recoverable in tort. *East River Steamship Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 871–75, 106 S.Ct. 2295, 2302–04, 90 L.Ed.2d 865 (1986). The Supreme Court's cogent reasoning has not been limited to admiralty cases. Courts have applied the *East River* decision to the issue presented in this case: whether a plaintiff can recover in common-law tort for pure economic losses? *E.g., Laurens Elec. Co-op v. Altec Industries,* 889 F.2d 1323, 1325–26 (4th Cir.1989) (predicted the Supreme Court of South Carolina would follow *East River*); *Aloe Coal Co. v. Clark Equipment Co.,* 816 F.2d 110, 116–118 (3rd Cir.) (believed the Pennsylvania courts would apply *East River* despite the Third Circuit's earlier decision in *Pennsylvania Glass*), *cert. denied,* 484 U.S. 853, 108 S.Ct. 156, 98 L.Ed.2d 111 (1987);

and *Richard O'Brien Companies v. Challenge–Cook Bros.,* 672 F.Supp. 466, 471–73 (D.Colo.1987). If applied to this case, the holding and rationale in *East River* would produce the same result, but in a more expeditious and unconfutable fashion. Though resort to the *East River* decision is unnecessary in this case, this court would not be reluctant, if called upon, to say that on this issue the Kansas Supreme Court would adopt the Supreme Court's reasoning in *East River* over the Tenth Circuit's approach in *Daitom.*

### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff moves for summary judgment on Kutter's counterclaims against it. Plaintiff sets forth nine pages or twenty-three paragraphs of proposed uncontroverted facts, and defendant purports to controvert sixteen of those paragraphs and offers ten additional paragraphs of uncontroverted facts. Some of the uncontroverted facts are repetitious of those previously stated in this order. Rather than lengthen this order unnecessarily, the court will simply refer to the necessary uncontroverted facts in its discussion of the legal issues.

In the theories of recovery section of the pretrial order, Kutter's claims against the plaintiff are found:

> The defendant and third-party plaintiff Kutter Products claim it is entitled to recover upon the theory that the plaintiff and/or Love Box Company were negligent in failing to instruct Kutter regarding the prevention of infestation and that they breached the contract in failing to take possession of the infested bird feeders and/or instruct Kutter regarding the disposition of the bird feeders. Kutter also claims that plaintiff concealed its knowledge of the infestation and that Love Box misrepresented facts concerning the contract with Kutter.

(Dk. 115, p. 15). As argued by the parties, even though the pretrial order is far from clear on this point, Kutter's breach of contract claim has as its factual premise that Nature's Share and Love Box were joint

venturers. Nature's Share moves for summary judgment on this counterclaim arguing the lack of evidence to show a joint venture.

 Though initially developed to reach associations that did not meet the technical requirements of partnerships, a joint venture still approximates a partnership. *In re Groff,* 898 F.2d 1475, 1476 (10th Cir.1990). A joint venture is generally defined as "a special combination of two or more persons devoted to a specific enterprise in which profit is jointly sought without actual partnership or corporate designation." *Opco, Inc. v. Scott,* 321 F.2d 471, 473 (10th Cir.1963) (citations omitted). Stated another way, "it is an association of two or more persons to carry out a single business enterprise for profit." *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.,* 226 Kan. 70, 75, 596 P.2d 816 (1979) (quoting *Stricklin v. Parsons Stockyard Co.,* 192 Kan. 360, 363, 388 P.2d 824 (1964)). The burden of proof rests with the party asserting a joint venture. *Yeager v. Graham,* 150 Kan. 411, 416, 94 P.2d 317 (1939). A joint venture does not ensue from an association without an agreement, whether it is express or implied from the parties' mutual conduct. *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.,* 226 Kan. at 75, 596 P.2d 816. In *Modern Air,* the Kansas Supreme summarized:

> Among the acts or conduct which is indicative of a joint venture, but no single one of which is controlling in the determination, are: (1) the joint ownership and control of property; (2) the sharing of expenses, profits and losses, and having and exercising some voice in determining the division of the net earnings; (3) a community of control over and active participation in the management and direction of the business enterprise; (4) the intention of the parties, express or implied; and (5) the fixing of salaries by joint agreement.

226 Kan. at 76, 596 P.2d 816. Simply stated, a joint venture depends upon three elements: joint ownership, joint operation, and express or implied agreement to share in the profits and losses. *Yeager,* 150 Kan. at 418–19, 94 P.2d 317.

An express or implied agreement to share profits is essential to a joint venture. 46 Am Jur.2d Joint Ventures §§ 13, 44 (1969). *See Yeager v. Graham,* 150 Kan. at 419, 94 P.2d 317. Kansas law attaches such importance to the profit-sharing element that it will presume in the absence of an express agreement that joint venturers will share equally in the profits. *Collingwood v. Palmer,* 144 Kan. 636, 641, 62 P.2d 910 (1936). This is not to say that a joint venture relationship in some instances may not also depend upon the answers to other questions, such as, who controlled the project, who made the final decisions, who contracted for the components, who was sent the bills, who eventually paid the bills, who marketed the feeders, and who maintained the inventory. Even though contested in this case, the answers to these questions do not point to any agreement between Love Box and Nature's Share to share the profits from any bird feeder sales.

 Plaintiff is entitled to summary judgment for the simple reason that Kutter is unable to show an express or implied agreement between Nature's Share and Love Box to share profits. The uncontroverted evidence establishes the parties at all times operated with the understanding that Love Box's only income from the project was its payment for supplying the corrugated materials. The record shows Love Box substantially assisted the principals of Nature's Share in starting up the project, but these efforts were taken to establish a good customer relationship and not to further a profit interest in the actual sales of the bird feeders. Furthermore, the court is convinced a component part manufacturer's profit from the sale of its components is not a joint venture interest in the seller's profits from the sale of the assembled product. If the rule were otherwise, cooperation between businesses, suppliers and customers would carry a new scenario of legal risks and costs. The plaintiff is granted summary judgment on its argument that Kutter is unable to prove a joint venture between Nature's Share and Love Box.

Kutter also claims Nature's Share was negligent in failing to instruct Kutter on the prevention of insect infestation. Kutter contends in the pretrial order that plaintiff, as the developer of the product, had the duty "to properly specify fumigation, establish a quality control program, including, inspection, periodic monitoring and shelf rotation." Plaintiff concedes someone in this project should have instituted quality control measures, but denies ever owing the duty to Kutter to instruct it on a quality control program. Kutter considers plaintiff's duty to be proved by the expert witnesses' testimony that Nature's Share, as the product developer, was responsible for creating such a quality control program and informing Kutter of it.

For one to recover in tort, he must show the other party owed him a duty which was breached. *Koplin v. Rosel Well Perforators, Inc.*, 241 Kan. 206, 212, 734 P.2d 1177 (1987). Negligence does not exist in the abstract; a legal duty owed from one party to another must have been breached. *Tappen v. Ager*, 599 F.2d 376, 379 (10th Cir.1979). The existence of a duty is a question of law. *Durflinger v. Artiles*, 234 Kan. 484, 488, 673 P.2d 86 (1983). Negligence is the lack of due care and can be an act of omission or commission. *Owings v. Gifford*, 237 Kan. 89, 93, 697 P.2d 865 (1985). In this instance, the issue is whether the source of the plaintiff's alleged duty to Kutter is one of contract or tort.

Kansas courts have explored the differences between tort and contract actions:

A breach of contract may be said to be a material failure of performance of a duty arising under or imposed by agreement. A tort, on the other hand, is a violation of a duty imposed by law, a wrong independent of contract. Torts can, of course, be committed by parties to a contract. The question to be determined here is whether the actions or omissions complained of constitute a violation of duties imposed by law, or of duties arising by virtue of the alleged express agreement between the parties.
. . . .

In *Yeager v. National Cooperative Refinery Ass'n*, 205 Kan. 504, 509, 470 P.2d 797 [1970], we quoted the rule from 52 Am.Jur., Torts, § 26, p. 279:

"*Where a contractual relationship exists between persons and at the same time a duty is imposed by or arises out of the circumstances surrounding or attending the transaction, the breach of the duty is a tort* . . . ."

. . . .

The Washington Supreme Court formulated a test to be used in determining whether a pleading sets up a case in contract or in tort. In *Yeager v. Dunnavan*, 26 Wn.2d 559, 174 P.2d 755 [1946], it said:

"... When an act complained of is a breach of specific terms of the contract, without any reference to the legal duties imposed by law upon the relationship created thereby, the action is in contract, *but where there is a contract for services which places the parties in such a relation to each other that, in attempting to perform the promised service, a duty imposed by law as a result of the contractual relationship between the parties is violated through an act which incidentally prevents the performance of the contract then the gravamen of the action is a breach of the legal duty, and not of the contract itself* . . . ."

*Malone v. University of Kansas Medical Center*, 220 Kan. 371, 374–76, 552 P.2d 885 (1976) (Patient's action against Medical Center was in tort arising from the contract to provide medical services) (underlining added) (other emphasis in original). *See also Atkinson v. Orkin Exterminating Co.*, 5 Kan.App.2d 739, 745, 625 P.2d 505, *aff'd and remanded*, 230 Kan. 277, 634 P.2d 1071 (1981) (While the homeowner's relationship with Orkin was based on a contract to treat the home for termites, the homeowner's action for negligent treatment sounded in tort). In both cases, the Kansas appellate courts recognized a duty actionable in tort stemming from the parties' service contract.

■ More recently, the Kansas Supreme Court reversed a trial court's decision to submit plaintiff's tort claims to the jury because the defendant's alleged tortious actions, resort to legal process upon the plaintiff's default, were actions expressly authorized by their contract. *Ford Motor Cred. Co. v. Suburban Ford*, 237 Kan. 195, 203–04, 699 P.2d 992, *cert. denied*, 474 U.S. 995, 106 S.Ct. 409, 88 L.Ed.2d 360 (1985). The court there quoted with approval a lengthy passage from *Isler v. Texas Oil & Gas Corp.*, 749 F.2d 22, 23–24 (10th Cir.1984); only a portion of it is quoted here:

> "The effect of confusing the concept of contractual duties, which are voluntarily bargained for, with the concept of tort duties, which are largely imposed by law, would be to nullify a substantial part of what the parties expressly bargained for—limited liability.... Tort law proceeds from a long historical evolution of externally imposed duties and liabilities. Contract law proceeds from an even longer historical evolution of bargained-for duties and liabilities. The careless and unnecessary blanket confusion of tort and contract would undermine the carefully evolved utility of both.
>
> In tort, the legislatures and the courts have set the parameters of social policy and imposed them on individual members of society without their consent. The social policy in the field of contract has been left to the parties themselves to determine, with judicial and legislative intervention tolerated only in the most extreme cases....
>
> ....
>
> [T]he facts alleged in plaintiff's tort claim are precisely the same as those alleged in their contract claim. Because the contract specifically defined the rights and duties of the parties regarding rental payments and notice, thereby precluding any extracontractual tort duty regarding such payments, we must reverse the judgment for plaintiffs sounding in tort. Accordingly, we need not reach defendant's other claims."

237 Kan. at 203–04, 699 P.2d 992 (quoting *Isler*, 749 F.2d at 23–24). The point in *Isler* is that a party cannot have a tort duty when the party's same duties and rights are specified by contract. Complex litigation often blurs the distinction between tort and contract actions. With some success, the courts in Kansas have struggled to keep the actions conceptually separate. In other words, although recognizing in some cases a separate legal duty between contracting parties to exercise reasonable care so as not to harm the other's person or property, Kansas courts will not allow a tort action upon a legal duty that has been supplanted or modified by the parties' contract. *See Ritchie Enterprises v. Honeywell Bull, Inc.*, 730 F.Supp. 1041, 1051–52 (D.Kan.1990).

The holdings in the Kansas decisions are consistent with the general rules followed in other jurisdictions. It is a postulate that a contract may serve to create a relationship that thereby triggers certain independent legal duties. A contract for services imposes a duty of due care on each contracting party apart from the duties and rights specifically expressed in the contract. *Hess Oil Virgin Islands Corp. v. UOP, Inc.*, 861 F.2d 1197, 2101 (10th Cir. 1988); *DCR, Inc. v. Peak Alarm Co.*, 663 P.2d 433, 435–37 (Utah 1983). This rule is embodied in § 323 of the Restatement (Second) of Torts (1965), which reads:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from this failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

Comment a to this section explains:

> This Section applies to any undertaking to render services to another which the defendant should recognize as necessary for the protection of the other's person or things. It applies whether the harm to the other or his things results from the defendant's negligent conduct

in the manner of his performance of the undertaking, or from his failure to exercise reasonable care to complete it or to protect the other when he discontinues it. It applies both to undertakings for a consideration, and to those which are gratuitous.

The Kansas Supreme Court has adopted § 323 as a correct statement of the law in Kansas. *Circle Land & Cattle Corp. v. Amoco Oil Co.*, 232 Kan. 482, 488, 657 P.2d 532 (1983). "The law imposes an obligation upon everyone who attempts to do anything, even gratuitously, for another, to exercise some degree of care and skill in the performance of what he has undertaken...." *Id.* at 488, 657 P.2d 532.

 Kutter does not allege the plaintiff's duty to warn or instruct Kutter on how to handle and monitor the bird seed in order to prevent infestation originated from a promise in any contract between them. There is no basis in the record for the court to find that plaintiff's duty was expressed in a contract so as to preclude a tort action. The duty as it is alleged and exists in this case arises from the plaintiff's general duty of care which accompanies the ongoing contractual relationship between Kutter and plaintiff for developing, managing and assembling the bird feeder project. Expert testimony on industry custom is one method of establishing the scope and contours of a party's duty of due care in a business or construction project. *See McGowan v. Cooper Industries*, 863 F.2d 1266, 1269–70 (6th Cir.1988). Based upon the testimony of Kutter's expert witnesses and the plaintiff's general duty to exercise due care so as to not harm Kutter's property, summary judgment on Kutter's negligence must be denied.

 Plaintiff seeks summary judgment on Kutter's claim of fraudulent concealment arguing it is supported by nothing more than "pure speculation and conjecture." The only references to this claim of Kutter's in the pretrial order is as an issue of fact, "Whether a claim of fraud can be made by Kutter against either Nature's Share or Love Box Company?," and as a theory of recovery, "Kutter also claims

that plaintiff concealed its knowledge of the infestation...." (Dk. 116, pp. 8, 15). In its response to plaintiff's motion, Kutter fleshes out the facts to its fraudulent concealment claim. It appears to be based upon the plaintiff's concealing their knowledge of infestation from July 16, 1987, when plaintiff learned that some of the assembled and shipped bird feeders were infested with insects, to July 23, 1987, when the plaintiff's representatives visited Kutter's plant in Kansas City and informed it that infestation. Kutter ascribes a motive to plaintiff's alleged concealment. Concerned over recovering their damages in a lawsuit, the plaintiff's principals delayed telling Kutter until they could visit Kutter's plant and examine the inventory and establish fault on Kutter.

Plaintiff appears to argue there is no evidence of an act of concealment or of an intent on its part to conceal the fact of infestation. Though neither party considered it necessary to brief the Kansas law on a fraudulent concealment claim or to analyze Kutter's claim under that law, this court thinks it important and will do so. Fraud encompasses "anything calculated to deceive, including all acts, omissions, and concealments involving a breach of legal or equitable duty, trust, or confidence resulting in damage to another." *Goben v. Barry*, 234 Kan. 721, Sy. ¶ 8, 676 P.2d 90 (1984). The general rules governing a fraudulent concealment claim are found in *Lynn v. Taylor*, 7 Kan.App.2d 369, 371, 642 P.2d 131, *rev. denied*, 231 Kan. 801 (1982):

> When one party to a contract or transaction has superior knowledge, or knowledge which is not within the fair and reasonable reach of the other party and which he could not discover by the exercise of reasonable diligence, or means of knowledge which are not open to both parties alike, he is under a legal obligation to speak, and his silence constitutes fraud, especially when the other party relies upon him to communicate to him the true state of facts to enable him to judge the expediency of the bargain. *Sippy v. Cristich*, 4 Kan.App.2d 511, Syl. ¶ 2, 609 P.2d 204 (1980). Furthermore,

actual knowledge of the defect must be shown to support a claim of fraudulent concealment, *Miles v. Love*, 1 Kan. App.2d 630, 632, 573 P.2d 622, *rev. denied*, 223 Kan. clxxi (1977), and the matters concealed must be material to the transaction. *Griffith v. Byers Construction Co.*, 212 Kan. 65, 73, 510 P.2d 198 (1973).

. . . .

A matter is material if it is one to which a reasonable person would attach importance in determining his choice of action in the transaction in question. *Sippy*, 4 Kan.App.2d at 516 [609 P.2d 204].

Kutter's fraudulent concealment claim fails to satisfy all of the elements to such a claim. There is no evidence the plaintiff had a legal obligation to inform Kutter, anytime before it did, of the fact that some of the bird feeder samples were infested with insects. Even more importantly, Kutter by the exercise of reasonable diligence should have discovered that the bird seed stored in its own warehouses was infested with insects, particularly since it has admitted knowing the insect eggs in the bird seed would hatch within six to nine months. Plaintiff is entitled to summary judgment on Kutter's fraudulent concealment claim.

## LOVE BOX'S MOTION TO DISMISS

Love Box seeks to dismiss, or in the alternative, summary judgment on counts two and three of Kutter's third-party complaint. Count two, as now alleged in the pretrial order, concerns Love Box's negligence in failing to instruct Kutter regarding the prevention of infestation. Count three, as now found in the pretrial order, alleges that "Love Box must indemnify Kutter for Love's negligence and breach of contract should plaintiff obtain a judgment against Kutter." (Dk. 116, p. 15).

■ Love Box's attack on the negligence claim is essentially the same as that made by plaintiff on Kutter's negligence counterclaim. The court's holding and rationale on plaintiff's argument is equally applicable here. Love Box has not shown that its duty to warn or instruct Kutter on

handling and monitoring the bird seed was expressed in the contract between them. The duty of due care asserted against Love Box is an independent legal duty which merely accompanies the contractual relationship. Love Box's motion on Kutter's negligence claim is denied for the reasons set forth above.

■ Love Box next challenges Kutter's indemnity claim on a number of grounds. First, the action for indemnity is premature, since Kutter, as the indemnitee, has not yet suffered any actual loss. Second, Kutter has no cause of action for implied indemnity in contract. Third, indemnification is not proper in a comparative negligence case, since any fault attributable to Love Box can be compared at the trial upon Kutter's motion. Third, the doctrine of comparative implied indemnity is not available to Kutter as it has not settled with the plaintiff. Avoiding most of these challenges, Kutter explains its indemnity claim is based upon it being an agent of Love Box and acting at the direction of Love Box in taking the actions upon which the plaintiff's claims are based.

The court above granted summary judgment in favor of Kutter on plaintiff's tort claims. Consequently, the only claim remaining for indemnity is whether it is entitled to indemnification from Love Box if Kutter is found to have breached its implied contract with plaintiff. Kutter has not shown how its agency theory sustains a basis for indemnity on the plaintiff's contract claim. Nor has it shown that Kansas law permits it to bring an implied indemnity action for its liability on a contract breach. In fact, Kansas law appears to limit implied indemnity to tort actions. *Haysville U.S.D. No. 261 v. GAF Corp.*, 233 Kan. at 642, 645–46, 666 P.2d 192. Moreover, if Kutter caused damages in its breach of the alleged contract with plaintiff, it would not be paying what another party ought to pay for purposes of implied indemnity. Finally, there is no evidence that Kutter acted as an agent of Love Box when it entered into the alleged contract with plaintiff. Love Box is entitled to summary judgment on Kutter's indemnity claim.

## NATURE'S SHARE'S MOTION TO AMEND THE PRETRIAL ORDER

This motion is granted.

IT IS THEREFORE ORDERED that Kutter's motion for summary judgment (Dk. 119) is denied as to plaintiff's contract claims and granted as to plaintiff's negligence claims;

IT IS FURTHER ORDERED that S & R's motion for summary judgment (Dk. 123) is granted;

IT IS FURTHER ORDERED that Nature's Share's motion for partial summary judgment (Dk. 117) is denied as to Kutter's negligence claim and granted as to Kutter's counterclaims based on a joint venture and fraudulent concealment;

IT IS FURTHER ORDERED that Love Box's motion to dismiss or in the alternative for summary judgment (Dk. 121) is denied as to Kutter's third-party claim for negligence and granted as to Kutter's third-party claim for indemnity;

IT IS FURTHER ORDERED that Nature's Share's motion to amend the pretrial order (Dk. 141) is granted.